In the Supreme Court of Georgia

Decided:     June 16, 2014

S14A0410. LOWE V. THE STATE.

HINES, Presiding Justice.

Marquis Torez Lowe ("Lowe") appeals from his convictions and

sentences for malice murder and possession of a firearm during the commission

of the crime of malice murder in connection with the death of Dajohn Milton.

For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that Milton

arranged for a friend to drive him to a certain apartment complex; en route,

[1]The crimes were committed on March 20, 2011. On May 31, 2011, a Houston County grand jury indicted Lowe for malice murder, felony murder while in the commission of aggravated assault, felony murder while in the commission of aggravated battery, aggravated assault, aggravated battery, possession of a firearm during the commission of the crime of malice murder, possession of a firearm during the commission of the crime of aggravated assault, and possession of a firearm during the commission of the crime of aggravated battery. Lowe was tried before a jury February 6-9, 2012, and found guilty on all counts. On February 10, 2012, he was sentenced as a recidivist to life in prison without the possibility of parole for the crime of malice murder, and a consecutive term of five years in prison for possession of a firearm during the commission of the crime of malice murder; the remaining convictions either merged with a crime for which a sentence was entered or were vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-374 (4) (5) (434 SE2d 479) (1993). Lowe moved for a new trial on February 13, 2012, amended the motion on March 28, 2012, and again on May 7, 2012. On August 8, 2013, the motion, as amended, was denied. Lowe filed a notice of appeal on September 5, 2013, and the appeal was docketed in this Court for the January 2014 term and submitted for decision on the briefs.

Milton used the friend's cell phone to place a call to a cell phone of Lowe's. A few minutes later, gunshots were heard in the apartment complex, and a man was seen standing over Milton, shooting down. The shooter fired multiple times and began to walk away; the shooter then appeared to hear something, walked back toward Milton, and shot him several more times before the shooter and another man walked away. A witness went to the site of the shooting and found Milton on the ground; Milton said he had been shot by "Trey Deuce," which is an alias of Trey Dinkins. An ambulance arrived, Milton was taken to a hospital, and died shortly thereafter, having sustained nine bullet wounds.

While police officers were at the scene of the shooting shortly after it occurred, two women approached a police officer and asked if the victim was Trey Dinkins; the police officer said no. Lowe's cell phone was found at the scene of the shooting, and its history revealed that it had received the call placed from the cell phone of Milton's friend shortly before the shooting.

The two men who left the scene of the shooting immediately after Milton was shot fled in the direction of a mobile home park. At the mobile home park, a resident saw them walking along the property's fence line; the two men removed their white t-shirts, put on black t-shirts, placed something along the

2

fence line, and left. Later that night a man arrived in a white car with a dent in its front; he exited the car, and appeared to search the area for something. A later search of this site by law enforcement officers produced a .38 caliber revolver and a .380 caliber pistol wrapped in a white t-shirt; the .380 caliber pistol was determined to be the weapon used to shoot Milton.

Shortly after the shooting, Dinkins telephoned a female friend, Chastain, said that he "had just gotten into it," and needed a ride. Chastain, along with another woman, drove to the location Dinkins identified, and found Dinkins and Lowe together; during the drive to another location, Lowe said that he might have dropped his cell phone. When they arrived at the later location, Dinkins and Lowe approached Smith, who was in her white car which had a dented hood; Smith had already told a companion that she did not want to lend her car to him. Lowe and Dinkins argued and Smith told them to get in her car or she would leave; Lowe told her that this was not a time "to be running [her] mouth" as she "could lose [her] life." The two men returned to Chastain's car, and she drove them to the home of a relative of Lowe's, and left them there.

Lowe was apprehended nine days after the shooting, hiding in a bedroom closet in a house; two cell phones were in the bedroom. While he was in jail

3

awaiting trial, Lowe told Blaine Arnold that: together with Dinkins, and through a woman, they set up a drug deal with Milton but that they actually intended it to be a robbery; when Milton resisted, Dinkins shot him with a .380 caliber pistol; and, upon seeing that Milton was still alive, Lowe took Dinkins's pistol and shot Milton again. Arnold further testified that Lowe told him that the men went to a nearby mobile home park, put the .380 caliber pistol, and another handgun not used in the shooting, inside a t-shirt, which they hid in a bush, and telephoned two women for a ride.

1. Lowe contends that the evidence against him was insufficient to prove beyond a reasonable doubt that he was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979). He questions the credibility of witness Arnold, but it is for the jury to assess the credibility of witnesses, not this Court, and the jury's resolution of such adversely to a criminal defendant does not render the evidence insufficient. *Heidt v. State*, 292 Ga. 343, 345 (1) (736 SE2d 384) (2013). Lowe also notes that there was no eyewitness to the shooting who identified him as a perpetrator, and that no forensic evidence placed him at the crime scene, but the fact that the evidence against him was largely circumstantial does not render it insufficient;

4

questions as to the reasonableness of hypotheses other than the guilt of the defendant are generally for the jury to decide, and this Court will not disturb a finding of guilt unless the evidence is insupportable as a matter of law. *Daniels v. State*, 281 Ga. 226, 228-229 (2) (637 SE2d 403) (2006). Nor does the circumstantial evidence presented by the State show that Lowe was, at most, merely present at the scene when Dinkins shot Milton, rather than acting as a party to the crimes. See *Jones v. State*, 292 Ga. 656, 658 (1) (a) (740 SE2d 590) (2013). Rather, the evidence authorized the jury to draw reasonable inferences about Lowe's participation in the crimes; it was Lowe whom Milton telephoned just before the shooting, not Dinkins, and when Dinkins's mother searched for him after the shooting, she telephoned Lowe. Lowe and Dinkins were together shortly after the shooting, and, as noted, Dinkins said he "had just gotten into it" and needed a ride, and Lowe said he may have lost his cell phone, which was found at the scene of the shooting. "'Presence, companionship, and conduct before and after an offense is committed are circumstances from which participation in the criminal act may be inferred.' [Cits.]" *Rush v. State*, 294 Ga. 388, 399 (1) (754 SE2d 63) (2014). The evidence authorized the jury to find Lowe guilty of the crimes for which he was convicted. *Jackson*, supra.

2. At trial, the State introduced 12 exhibits that were identified as either shell casings or projectiles found at the scene of the shooting, or projectiles taken from Milton's body during the autopsy. The identifying witness testified that she collected each item from the crime scene, or was given it during the autopsy by the physician performing the autopsy, she placed each item in a box that she then marked, and that each box at trial bore her markings. Lowe objected to the admission of each of these exhibits on the ground that, although the witness identified the items and the boxes in which they were enclosed, she did not identify each envelope in which each box was sealed, those envelopes having been marked by an individual who did not testify at trial.

What the State must do with evidence such as bullet casings and projectiles is establish "with reasonable certainty that the [items] introduced into evidence were the same ones [recovered earlier] and had not been tampered with or replaced." *Moore v. State*, 285 Ga. 157, 158 (2) (674 SE2d 315) (2009) (Citation and parenthetical omitted.) This the State did. Even if these items were fungible rather than separate objects, the failure to have each person who was in control of the challenged evidence testify at trial would "not, without more, make the substance or testimony relating to it inadmissible." *Collins v.*

6

*State*, 290 Ga. 505, 506 (2) (722 SE2d 719) (2012) (Citation and punctuation omitted.)

3. Lowe asserts that the trial court erred in denying his motion to suppress a .40 caliber handgun recovered from the home in which he was apprehended pursuant to an arrest warrant, contending that the search of the home and seizure of the weapon violated his rights under the Fourth Amendment to the Constitution of the United States. See *Geiger v. State*, ___ Ga. ___, ___ (2) (___ SE2d ___) (2014) (Case no. S14A0168, decided May 19, 2014). When such a motion is made,

> [a]lthough "the burden of proving that the search and seizure were lawful shall be on the [S]tate," [Cits.], the defendant bears the burden of proof where his or her standing to raise a challenge to the legality of a search or seizure is contested by the State. [Cits.]

*Stinski v. State*, 281 Ga. 783, 783-784 (1) (642 SE2d 1) (2007). And, at the hearing on the motion to suppress, the State clearly contested Lowe's standing to challenge the search of the home and the seizure of the weapon found there, asserting that he was not a resident of the house, nor did he have any standing otherwise, but that "he's just there." Nonetheless, neither at the hearing on the motion to suppress, at trial, in his pleadings, nor at the hearing on his motion for

7

new trial,[2] did Lowe attempt to meet his burden of proof to show that he had standing to move to suppress this evidence.

4. Finally, Lowe contends that his trial counsel failed to provide effective representation in several respects. In order to prevail on such a claim, he must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong of the test, he must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. Id. at 783. "'We accept the trial court's

---

[2] In his second amended motion for new trial, Lowe enumerated the denial of the motion to suppress as one of the grounds justifying a new trial.

factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

At the hearing on the motion for new trial, Lowe testified that trial counsel visited him at the jail four times before trial, but "never talked to me." Although this testimony was rebutted by that of counsel, in any event, there is "no magic amount of time which counsel must spend in actual conference with his client." *Harris v. State*, 279 Ga. 304, 307 (3) (b) (612 SE2d 789) (2005) (Citations and punctuation omitted.). Although Lowe speculates that further contact with counsel might have enabled them to develop a more fruitful plan of defense than the one pursued at trial, he does not show what that might have been, or how additional contact with counsel might have produced such; thus, he fails to demonstrate how spending additional time with counsel would have changed the outcome of his case. *Ruffin v. State*, 283 Ga. 87, 91 (12) (d) (656 SE2d 140) (2008). Similarly, Lowe points to the fact that, before trial, counsel did not interview all of the potential witnesses, but again, he fails to show that, had counsel done so, some evidence would have been revealed that would have

9

altered the outcome of his trial.[3] See *Reaves v. State*, 292 Ga. 545, 550 (4) (739 SE2d 368) (2013).

Finally, Lowe testified at the hearing on his motion for new trial that he wanted to testify at trial, but trial counsel "talked [him] out of it."[4] However, even if Lowe's post-trial testimony were credited, he has presented no evidence as to what the content of any trial testimony would have been, and thus fails to show how such testimony would have altered the outcome of his trial. *Sims v. State*, 278 Ga. 587, 591 (3) (d) (604 SE2d 799) (2004).

<u>Judgments affirmed. All the Justices concur.</u>

---

[3] Lowe specifically notes that counsel did not interview Arnold before trial, but counsel testified that Arnold was represented by an attorney at the time, he met with the attorney, and reviewed Arnold's video-recorded statement before trial. On cross-examination, counsel elicited from Arnold that he faced nine charges of burglary and sentences totaling over 180 years; Arnold denied that he had received any deal from the State in exchange for his testimony against Lowe.

[4] During the hearing on the motion for new trial, trial counsel testified that he advised Lowe not to testify in his own behalf because, although Lowe believed he could show the jury that he was a person of good character, his criminal record would indicate otherwise. At trial, after the last witness testified, the trial court advised Lowe that the decision whether to testify was his, despite any consultation he had with counsel. Before closing arguments the next day, the court again advised Lowe that whether to testify was a decision he must make, and Lowe affirmed on the record that it was his decision not to testify.