303 Ga. 385
FINAL COPY


S17A1646. KEMP v. THE STATE.
S17A1647. HOGANS v. THE STATE.
S17A1648. WATKINS v. THE STATE.


PETERSON, Justice.

Derek Kemp, Harvey Hogans, and Alphonso Watkins appeal from their convictions for malice murder and other crimes in connection with the shooting death of Derek Gray.[1] Kemp and Watkins challenge the sufficiency of the evidence to support their convictions, and the defendants all raise various

[1] The crimes occurred on July 1, 2011. An indictment filed on October 7, 2011 charged all of the defendants with malice murder (count 1), two counts of felony murder (counts 2 and 3), aggravated assault (count 5), violation of the Georgia Street Gang Terrorism and Prevention Act (count 6), armed robbery (count 7), concealing the death of another (count 8), and possession of a firearm during the commission of a crime (count 9). The indictment also charged Kemp with an additional count of felony murder (count 4). Following a joint trial in January 2014, the jury found Kemp guilty of all counts except for one count of felony murder (count 4) and the gang charge (count 6). The jury also found Watkins and Hogans guilty on all counts for which they were indicted, except for a felony murder count (count 3) and the gang charge (count 6). The trial court sentenced the defendants to life without parole for malice murder, a concurrent life term for armed robbery, a concurrent ten-year term for concealing the death of another, and a consecutive five-year term for the firearm offense. The trial court vacated the felony murder counts and merged the aggravated assault counts into malice murder. The defendants filed motions for new trial, which were denied by the trial court on June 27, 2016. The defendants filed timely notices of appeal, and their cases were docketed to this Court's August 2017 term. Kemp's appeal was orally argued, and Hogans's and Watkins's appeals were submitted for decisions on the briefs.

challenges to the testimony of Steve Lewis, a fellow gang member. Watkins also argues that the trial court erred in permitting a "non-examining doctor" to testify about the post-mortem examination of the victim. The defendants also purport to "preserve" certain claims to the extent they may be applicable in future habeas proceedings.

We conclude that the evidence was sufficient to sustain the defendants' convictions, there was no error in admitting or refusing to strike Lewis's testimony, and the so-called "non-examining doctor" was the medical examiner who was allowed to testify about the autopsy he performed on the victim. The defendants' claims that they wish to "preserve" present nothing for review because the defendants have not raised any meaningful arguments on appeal in this respect. We affirm their convictions.

Viewed in the light most favorable to the jury verdicts, the trial evidence showed the following. Kemp and Watkins were gang members associated with the Loyal to the Gang ("LTG") faction of Gangster Disciples ("GD"). Although not a member of the gang, Hogans associated with Watkins and other GD members. In 2011, LTG members would typically have monthly meetings at the

2

apartment of "Captain Kirk" in the Mission Galleria apartment complex located off Cobb Parkway.

On the morning of July 1, 2011, Gray borrowed $1,000 from his brother and told him that he planned to buy marijuana from Watkins, his long-time supplier. The defendants had a different plan: to lure Gray with the prospect of a drug deal and then rob him. Several days prior to the contrived drug deal, Kemp was overheard telling someone, "I'm going to rob this man for anything he got, I don't care. I need to eat, too. Whatever he got I'm taking."

Beginning at 8:30 p.m. on July 1 and continuing after Gray left his apartment at 9:00 p.m., Gray exchanged phone calls with Kemp and Watkins. Gray had at least $1,000 when he left the apartment. The last call from Kemp to Gray occurred at 9:58 p.m., at which time both men were located near Circle 75 Parkway. Watkins was also in the same area at that time. Cell tower records show that Kemp's cell phone started moving south toward Atlanta at about 10:17 p.m., pinging off a tower near I-20 at about 10:44 p.m. Cell tower records similarly show Watkins's cell phone moving south into the west side of Atlanta at about the same time.

Around 10:30 p.m., Michael Sanders was sitting outside his house located near the former site of the Georgia Dome in downtown Atlanta when a light-colored Ford Taurus pulled up. The car drove away after a man exited the vehicle and fell to the ground. The man, later identified by the police as Hogans, asked to use Sanders's phone to call an ambulance because he had been shot. An Atlanta police officer interviewed Hogans at the hospital, and Hogans gave evasive, vague, and inconsistent answers about the shooting. Atlanta police investigated Hogans's claims about his shooting but could find no evidence to corroborate Hogans's explanations for the shooting.

When Gray did not return home on the night of July 1, his wife began calling him and his friends. She then went searching for him and filed a missing person report the next morning. Later that day, a woman was walking from the Mission Galleria apartments toward Circle 75 Parkway when she found a dead body that was later identified as Gray. He had multiple gunshot wounds to his chest, buttocks, knee and thumb. Several .38 caliber bullets were recovered from his body.

On the morning that Gray's body was found, a Fulton County police officer responded to a call about a vehicle fire. The responding officer

4

concluded that the car was a Ford Taurus, but it was too severely burned to make out the car's color. Around the same time, a DeKalb County police officer visited Kemp in reference to Kemp's report that his silver Ford Taurus (which actually belonged to his mother) had been stolen. Kemp told the officer that he last saw the vehicle the previous night at about 9:00 p.m. Police later discovered that the burned vehicle was Kemp's Ford Taurus and that shots had been fired inside the vehicle.

Also on July 2, Watkins sent a text message asking the recipient, "Know somebody who want[s] to buy a strap," and specifying in another text message, "a .38 and .45 snub nose." Police also found on Watkins's cell phone a photograph of a .45 Taurus Judge revolver that Gray's brother identified as the same weapon that Gray had recently acquired.

Not long after the crimes, Watkins told fellow gang member Steve Lewis that Kemp and "his guy" messed up, but did not elaborate; unbeknownst to Watkins, Lewis had been working as a police informant for more than a year. In a subsequent conversation, Watkins said that he needed to get out of town, but did not explain why. Once rumors started circulating about a body being

found, Watkins told Lewis that "people gonna know they don't play no more because of what they going to find around the corner from Captain Kirk's crib."

By December 2011, Watkins had been arrested and shared a jail pod with Lewis, who had been arrested on unrelated charges and was no longer working as a police informant. According to Lewis, Watkins said that when Gray contacted him to buy marijuana, he responded that he didn't have any but that he would send someone who did to pick up Gray. Watkins said that Kemp and Hogans picked up Gray and drove him to the Mission Galleria apartments; while there, Hogans turned around and pointed a gun at Gray, who was sitting in the back seat. Gray pulled out his gun and shot Hogans, who returned fire and killed Gray. Watkins said he was waiting nearby and could see the gunfire. When Watkins got to the car, he said to Kemp and Hogans, "What the f**k," because they were only supposed to rob Gray. Watkins said that he, Kemp, and Hogans then dumped Gray's body, Hogans was dropped off with instructions to say he was shot by an armed robber, and Kemp was instructed to get rid of his car.

1. *The evidence was sufficient to sustain the defendants' convictions.*

Although only Kemp and Watkins argue that the evidence was insufficient to sustain their convictions, we consider the sufficiency of the evidence with

6

respect to all of the defendants (as is our general practice in murder cases).

When reviewing the sufficiency of the evidence under the standard set forth by

Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979), a

"reviewing court must consider all of the evidence admitted by the trial court,

regardless of whether that evidence was admitted erroneously." McDaniel v.

Brown, 558 U. S. 120, 131 (130 SCt 665, 175 LE2d 582) (2010) (citation and

punctuation omitted); see also Cowart v. State, 294 Ga. 333, 343 (6) (751 SE2d

399) (2013). Thus, although the defendants all challenge Lewis's testimony, we

consider that testimony in our sufficiency review.

(a) *Kemp's claims*.

Kemp argues that there was insufficient evidence to support his

convictions for malice murder, armed robbery, and possession of a firearm

during the commission of a felony.[2] We disagree.

Kemp argues that the evidence did not show that Gray's killing was done

with malice aforethought, because Hogans shot Gray only after Gray shot first

and there was no evidence that he or his co-conspirators planned to kill the

---

[2] Kemp's challenges to the guilty verdicts on the felony murder and aggravated assault counts are moot because these counts were vacated or merged. See White v. State, 287 Ga. 713, 715 (1) (a) (699 SE2d 291) (2010).

7

victim. A conviction of malice murder, however, does not require a showing that the defendant had a "'premeditation' or a 'preconceived' intention to kill; malice aforethought can be formed instantly." Wynn v. State, 272 Ga. 861, 861 (1) (535 SE2d 758) (2000). "Whether a killing is intentional and malicious is for the jury to determine from all the facts and circumstances." Oliver v. State, 276 Ga. 665, 666 (1) (581 SE2d 538) (2003).

Given the evidence outlined above, the jury was authorized to conclude that Hogans acted with malice in killing Gray. Specifically, the evidence shows that Hogans fired multiple shots at the victim at close range in Kemp's vehicle. Although Lewis testified that Watkins claimed that the victim fired the first shot, the jury was not required to believe every aspect of Lewis's testimony. See Tate v. State, 264 Ga. 53, 56 (3) (440 SE2d 646) (1994) ("The trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony."). In any case, the evidence establishes that Hogans was the aggressor in initiating the conflict by pointing a gun at the victim. After Hogans fired multiple shots that killed the victim, he and the other co-defendants dumped the victim's body and attempted to destroy evidence of the crime. From this evidence, the jury was authorized to conclude

that Hogans did not act with provocation or justification in shooting Gray and that he was guilty of malice murder.

Kemp also argues that he could not be held responsible for Gray's murder because the evidence does not show that he knew Hogans had a gun or planned to use it during the robbery. As Kemp concedes, the evidence was sufficient to establish that he conspired to commit and was a party to the robbery. Contrary to Kemp's argument, it was not necessary to establish that Kemp intended to use a firearm or to kill Gray in order for Kemp to be held liable for Hogans's actions, because it was a reasonably foreseeable consequence that the intended victim of a robbery would be killed. See Hicks v. State, 295 Ga. 268, 272-273 (1) (759 SE2d 509) (2014). As a result, "[t]he intent of the actual killer may be imputed to the other active members of the conspiracy even though the homicide may not have been a part of the original common design." Williams v. State, 276 Ga. 384, 385 (3) (578 SE2d 858) (2003). Thus, the jury could find Kemp criminally responsible for Gray's death because his participation in the robbery carried with it the foreseeable risk that Hogans would bring a gun to the robbery and use it to shoot and kill Gray. See McLeod v. State, 297 Ga. 99, 103 (2) (772 SE2d 641) (2015); Van Huynh v. State, 257 Ga. 375, 377 (359 SE2d 667)

(1987). And, although not contested by Kemp, the evidence was plainly sufficient to sustain his conviction for concealing the death of another.

(b) *Watkins's claims*.

Watkins argues that the evidence was insufficient because he did not participate directly in any crime against the victim, and the evidence did not rule out the reasonable hypothesis that he was merely near Gray's location in furtherance of a drug deal that in no way involved Hogans and Kemp. We reject his arguments.

Watkins admitted to Lewis that he contrived a fake drug deal whereby Kemp and Hogans would rob Gray and that he took part in destroying or concealing evidence of Gray's death. Moreover, after Gray's death, Watkins attempted to sell a gun that Gray's brother identified as belonging to Gray. Thus, regardless of whether Watkins was in the vehicle when Gray was shot, the jury was authorized to reject Watkins's claim that he was merely present in the area and was not involved with the planned robbery. See Lowe v. State, 295 Ga. 623, 625 (1) (759 SE2d 841) (2014) ("[Q]uestions as to the reasonableness of hypotheses other than the guilt of the defendant are generally for the jury to decide, and this Court will not disturb a finding of guilt unless the evidence is

insupportable as a matter of law."). And, as with Kemp's claims, because the evidence supports a finding that Watkins conspired with Kemp and Hogans to rob Gray and that he took part in destroying or concealing evidence of Gray's death, Watkins could also be found guilty of the crimes committed by his co-conspirators, even if he did not possess the gun or fire it. Therefore, the evidence was sufficient to support Watkins's convictions.

(c) *Hogans's convictions*.

As described above, the evidence was also sufficient to support Hogans's convictions.

2. *All of the defendants' challenges to the admission of Lewis's testimony fail.*

Raising various arguments, the defendants all contend that the trial court erred in admitting or refusing to strike Lewis's testimony about conversations he had with Watkins in which Watkins discussed the defendants' participation in the crimes.[3] We examine each argument in turn.

---

[3] Hogans also raises an ineffectiveness claim in the event we conclude that some of his challenges to Lewis's testimony were not properly preserved. We conclude that he did preserve his arguments and, therefore, do not consider them in the context of an ineffective assistance claim.

(a) *Watkins's statements to Lewis were not obtained in violation of his Sixth Amendment right to counsel.*

Hogans and Watkins argue that the trial court erred in denying their motions in limine to exclude Watkins's jailhouse confession to Lewis on the basis that the statements were obtained in violation of Watkins's right to counsel. Hogans and Watkins argue that Lewis was acting as a government agent at the time Watkins discussed the defendants' participation in the crimes, and that, as a result, Watkins's statements were inadmissible under Massiah v. United States, 377 U. S. 201 (84 SCt 1199, 12 LE2d 246) (1964), and its progeny.[4]

Under Massiah, the Sixth Amendment right to counsel is violated by the admission of incriminating statements that a government agent deliberately elicits in the absence of counsel after judicial proceedings have been initiated against the defendant. Higuera-Hernandez v. State, 289 Ga. 553, 554 (2) (714 SE2d 236) (2011); O'Kelley v. State, 278 Ga. 564, 565-567 (2) (604 SE2d 509) (2004), disapproved on other grounds by Stinski v. State, 286 Ga. 839, 856 (61)

---

[4] Although Hogans also purports to raise claims based on federal due process and the state constitutional right to counsel, he does not argue that his claims are to be analyzed differently in this context. Indeed, the cases he relies on concern only Sixth Amendment jurisprudence.

12

n. 5 (691 SE2d 854) (2010). An informant may be classified as a government agent "only if there is both (1) an agreement between the informant and government authorities to exchange incriminating information for payment, lenient treatment, or some other benefit and (2) some action by the informant designed deliberately to elicit incriminating information." Rai v. State, 297 Ga. 472, 478-479 (3) (775 SE2d 129) (2015). Neither of these elements is present here, and so the defendants' claim fails.

The evidence shows that, beginning in August or September 2010, Lewis began working as a confidential informant for a police unit charged with investigating organized crime and drug trafficking. When Gray was killed in July 2011, Watkins was already the subject of an ongoing investigation, and Lewis was providing information as part of that investigation. In July 2011, after Gray's death, Lewis told his police handler about conversations he had with Watkins.[5] The police officer, who was not involved in the murder investigation,

---

[5] Although neither Hogans nor Watkins challenges these statements, any such challenge would fail because the statements were made prior to Watkins's arrest and initial appearance in late July 2011. See O'Kelley, 278 Ga. at 566-567 (2) (where a defendant asserts his right to counsel at his initial appearance, his Sixth Amendment right to counsel attaches, even though the appearance is often not a critical stage of a criminal proceeding requiring the presence of counsel).

13

relayed Lewis's information to the detective investigating Gray's murder and told Lewis to stay in contact with Watkins. In November 2011, Lewis was terminated as a confidential informant when he became the subject of a criminal investigation unrelated to this case. Lewis testified that he was "gone" from September to December 2011, promptly arrested upon his return, and then placed into the same jail pod with Watkins. After he was arrested, Lewis continued to call his former police handler, asking for help and stating that he had information about this case. The police handler informed Lewis that he could not help Lewis, but he relayed the information to the lead detective, who subsequently interviewed Lewis about Watkins's incriminating statements. The police handler testified that he never initiated contact with Lewis after Lewis's arrest. Although the police handler had previously asked Lewis to stay in touch with Watkins, the police officer stated that he did not ask Lewis to elicit information from Watkins or the other defendants in this case.

Under these circumstances, there was no Massiah violation here. Watkins made the incriminating statements in December 2011, by which time Lewis's status as a confidential informant had been terminated. There was no evidence that the police promised Lewis any benefit whatsoever in exchange for obtaining

14

information from Watkins. Indeed, the police handler stated that he did not initiate contact with Lewis after his arrest and said he could not help Lewis in exchange for any information Lewis had. Thus, Lewis was not a government agent. See Burgan v. State, 258 Ga. 512, 515 (5) (371 SE2d 854) (1988) ("An inmate who acts upon the expectation of an unpromised reward does not thereby become an agent for the state." (citation and punctuation omitted)). Moreover, there is no evidence supporting Watkins's claim that Lewis deliberately elicited information from Watkins while they shared the same jail pod or did so under the direction of the police. As a result, Hogans's and Watkins's Sixth Amendment claims fail. See Higuera-Hernandez, 289 Ga. at 557 (2) (to establish a right to counsel violation, "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks" (citation and punctuation omitted)).

(b) *The trial court did not err in admitting Watkins's statements against Kemp and Hogans as co-conspirator statements under OCGA § 24-8-801 (d) (2) (E).*

Kemp and Hogans argue that the trial court erred in admitting Lewis's testimony about Watkins's statements against them under OCGA § 24-8-801 (d)

(2) (E) ("Rule 801 (d) (2) (E)"), because the hearsay statements were not made "during the course and in furtherance of" a conspiracy. We disagree.

Rule 801 (d) (2) provides that admissions by party-opponents shall not be excluded under the hearsay rule. As applicable here, an admission by a party-opponent includes a statement offered against a party that was made by a co-conspirator "of a party during the course and in furtherance of the conspiracy, including a statement made during the concealment phase of a conspiracy." OCGA § 24-8-801 (d) (2) (E). This co-conspirator rule, established with the passage of the new Evidence Code, largely tracks (but is not identical to) Rule 801 (d) (2) (E) of the Federal Rules of Evidence and also carries forward aspects of the co-conspirator rule that existed under our old Evidence Code — principally, that a conspiracy does not necessarily end upon the achievement of its object. State v. Wilkins, 302 Ga. 156, 158-159 (805 SE2d 868) (2017).

To admit evidence under Rule 801 (d) (2) (E), the State is required to show by a preponderance of the evidence that a conspiracy existed, the conspiracy included the declarant and the defendant against whom the statement is offered, and the statement was made during the course and in furtherance of the conspiracy. See United States v. Hasner, 340 F3d 1261, 1274 (11th Cir.

16

2003);[6] see also OCGA § 24-1-104 (a) (in determining whether evidence is admissible, courts are to resolve question under preponderance of evidence standard); Davis v. State, 302 Ga. 576, 583 (4) (805 SE2d 859) (2017) (proponent has to make a "prima facie" case of conspiracy to admit co-conspirator's statements). It is not required that a conspiracy be charged in order for a statement to be admissible under Rule 801 (d) (2) (E). OCGA § 24-8-801 (d) (2) (E).

In reviewing the trial court's decision regarding the admissibility of evidence, we accept the trial court's factual findings, such as whether a statement was made in furtherance of a conspiracy, unless they are clearly erroneous. See Wilkins, 302 Ga. at 160. We apply a liberal standard in determining whether a statement is made in furtherance of a conspiracy, and statements that further the interests of the conspiracy in some way meet this standard. Id. at 159; see also United States v. Flores, 572 F3d 1254, 1264 (11th Cir. 2009) ("The statement need not be necessary to the conspiracy, but must

---

[6] Where provisions of the new Evidence Code are borrowed from the Federal Rules of Evidence, we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit. See Olds v. State, 299 Ga. 65, 69 (2) (786 SE2d 633) (2016).

17

only further the interests of the conspiracy in some way." (citation and punctuation omitted)).

In denying the motions in limine to exclude Lewis's testimony regarding Watkins's statements, the trial court did not make any express factual findings, but we can infer from its denial of the motions that it implicitly found that Watkins's statements were made in the course of and in furtherance of a conspiracy. United States v. Walker, 799 F3d 1361, 1363 (11th Cir. 2015) (in reviewing the denial of a motion to suppress, appellate court reviews the district court's factfindings, both explicit and implicit, for clear error). Kemp and Hogans have failed to show that these implicit factual findings are clearly wrong.

(i) *The trial court was authorized to conclude that Watkins's statements were made in the course of a conspiracy.*

Kemp and Hogans argue that Watkins's statements were not made in the course of a conspiracy, because the conspiracy ended with Gray's death. But the defendants were alleged to have been part of a larger criminal conspiracy. See United States v. Bowe, 221 F3d 1183, 1193 (11th Cir. 2000) ("[T]he conspiracy that forms the basis for admitting a co-conspirator's out of court statements need

18

not be the same conspiracy for which the defendant is charged."). Namely, in addition to the allegations that they committed specific criminal acts against Gray, the defendants also were charged with one count of violating the Georgia Street Gang Terrorism and Prevention Act by committing the aggravated assault and armed robbery as part of the Gangster Disciples, an alleged criminal street gang. To establish a violation of that Act, the State had to show that the defendants were involved in a criminal street gang and that the enumerated acts were intended to further gang activity. See Rodriguez v. State, 284 Ga. 803, 805-807 (1) (671 SE2d 497) (2009). A "criminal street gang" is defined as an "organization, association, or group of three or more persons associated in fact . . . which engages in criminal gang activity." OCGA § 16-15-3 (2). Establishing that a group of people associated to engage in criminal gang activity is essentially proof of a conspiracy.  See Griffin v. State, 294 Ga. 325, 327 (751 SE2d 773) (2013) ("there must be an agreement between two or more persons to commit a crime" for a conspiracy to exist) (citation and punctuation omitted). Thus, to establish that the defendants had violated the Act, the State needed to establish proof of the existence of a criminal street gang (a general conspiracy among several individuals to commit crimes) and the commission of a specific

19

criminal act intended to further the gang's criminal purposes. See Rodriguez, 284 Ga. at 807 (1) ("Management of or participation with others in that criminal street gang activity necessarily implies knowledge of the gang's criminal activities and a specific intent to further its criminal purposes."); see also United States v. Wilson, 634 Fed. Appx. 718, 739 (11th Cir. 2015) ("The essence of the conspiracy charge was that the Appellants were all members of the same street gang, and, as such, evidence of the Appellants' membership in or affiliation with the Blood gang tended to make the prosecution's theory of the case more likely.").

Here, Lewis testified about the Gangster Disciples' existence and criminal gang activities. He also testified about the defendants' association with the Gangster Disciples. That Watkins would discuss his participation in crimes with Lewis, an admitted gang member, helped establish that Watkins was also associated with the gang. The fact that the defendants accomplished the specific acts charged — the crimes against Gray — did not necessarily end their involvement or association with the Gangster Disciples; nor did the criminal street gang's purpose necessarily end with those crimes. As a result, the trial

20

court was authorized to conclude that the State made a sufficient showing that Watkins's statements were made in the course of a conspiracy.

The fact that the defendants were ultimately acquitted of the gang charge does not alter the analysis. The trial court had to make a determination about the admissibility of the evidence before the conclusion of the trial and had to decide the factual question of whether the statements were made during the course of a conspiracy under a preponderance of the evidence standard. See OCGA § 24-1-104 (a) (preliminary questions regarding the admissibility of evidence are to be resolved under a preponderance of the evidence standard). The jury, on the other hand, made its determination about whether the specific crimes against Gray were committed to further the conspiracy (the gang), and its determination was made under a reasonable doubt standard.

(ii) *The trial court also was authorized to conclude that Watkins's statements were made in the furtherance of a conspiracy.*

Kemp and Hogans rightly argue that mere idle chatter or a narrative of past conduct is generally not considered to be in furtherance of the conspiracy. Narratives of past events, however, are admissible under Rule 801 (d) (2) (E) if they serve some present purpose in the conspiracy. "Statements made to solicit

21

membership or participation in the conspiracy and statements explaining the conspiracy to a new member are made in furtherance of the conspiracy." United States v. Miles, 290 F3d 1341, 1351 (11th Cir. 2002). Additionally, statements that promote cohesiveness among, or provide reassurance to, other conspirators are made in furtherance of a conspiracy.  See Flores, 572 F3d at 1264 (statements that fostered cohesiveness within a gang were in furtherance of gang's purpose); United States v. Holt, 777 F3d 1234, 1267 (11th Cir. 2015) (statement that was necessary to keep a co-conspirator abreast of the conspiracy's current status is in furtherance of the conspiracy). "The statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way." Miles, 290 F3d at 1351; see also  United States v. Powers, 75 F3d 335, 340 (7th Cir. 1996) ("The statement need not have been made exclusively, or even primarily, to further the conspiracy.").

Given the liberal standard we use to determine whether a statement is in "furtherance of a conspiracy," the trial court was authorized to conclude that Watkins's statements to Lewis met that standard.  The State sought to prove that the defendants were part of or associated with the same criminal street gang as Lewis, and this, as we explained above, was a type of conspiracy. Watkins's

22

statements to Lewis could be interpreted as fostering cohesiveness with another gang member or as providing information to a fellow co-conspirator (of the criminal street gang). The trial court was thus authorized to determine that the State established by a preponderance of the evidence that Watkins's statements about his involvement in the crime were in furtherance of the criminal street gang conspiracy. See Holt, 777 F3d at 1267; Flores, 572 F3d at 1264.[7]

(c) *The trial court did not err by denying Hogans's motion for a mistrial or striking Lewis's testimony on the ground that Lewis materially contradicted his pretrial statements.*

Hogans argues that the court should have granted his motion for a mistrial or stricken Lewis's testimony after Lewis testified that Hogans was the shooter, which materially contradicted his pretrial statements that Watkins and Kemp

---

[7] In passing, Hogans also argues that the admission of Watkins's statements violated the Confrontation Clause of the United States Constitution and a similar provision of the Georgia Constitution. Hogans cites only Crawford v. Washington, 541 U. S. 36 (124 SCt 1354, 158 LE2d 177) (2004) and Bruton v. United States, 391 U. S. 123 (88 SCt 1620, 20 LE2d 476) (1968), and does not make an argument that the Georgia Constitution should be interpreted differently in this case. That said, Hogans's claim is without merit, because he does not show, much less argue, that Watkins's out-of-court statements to Lewis were "testimonial." Indeed, the statements were made to a fellow gang member, who we have already determined was not a government agent. As a result, the admissibility of Watkins's out-of-court statements are governed by the rules on a co-conspirator's statements under the Evidence Code. See Billings v. State, 293 Ga. 99, 104 (4) (745 SE2d 583) (2013) (concluding that co-defendant's statements to girlfriend were not "testimonial" under Crawford standard because they were not the product of police investigation intended to produce evidence for trial, and therefore no Bruton violation occurred).

23

both shot Gray. Hogans cites cases where the prosecutor knowingly used perjured testimony and argues that his conviction was obtained in violation of his right to a fair trial, his right to effective assistance of counsel, and his due process rights. See Nwakanma v. State, 296 Ga. 493, 496 (2) (768 SE2d 503) (2015) (a conviction obtained through the prosecutor's knowing use of perjured testimony on a material point is a violation of the defendant's due process rights). Hogans, however, has failed to establish that Lewis's testimony was actually false. Indeed, Hogans argues only that the testimony was "unreliable and likely false." The fact that Lewis's testimony may have been inconsistent with prior statements does not constitute the knowing use of perjured testimony. See Brown v. State, 291 Ga. 750, 753-754 (3) (733 SE2d 300) (2012). The trial court correctly ruled in denying Hogans's motions that any inconsistent statements were matters for cross-examination, as they went to Lewis's credibility. Id. Under these circumstances, and because Hogans cross-examined Lewis with his prior inconsistent statements, the grant of a mistrial was not necessary to preserve Hogans's right to a fair trial. See Grant v. State, 298 Ga. 835, 838 (2) (785 SE2d 285) (2016) ("[T]he denial of a mistrial constitutes

24

reversible error only if it appears that a mistrial was required to preserve the defendant's right to a fair trial.").

(d) *There was no error in failing to declare a mistrial when Lewis testified about alleged death threats he received as a result of his cooperation.*

When Hogans was cross-examining Lewis about his prior statements to police and why he couldn't recall details as clearly as he had the day before on direct testimony, Lewis responded, "Yeah, and you cut us off and I been sitting in the hole." Hogans asked, "Yeah, kind of tough when you're sitting in the hole, isn't it?" Lewis answered, "Yeah. Contract on my head, so I can't be around everybody." The defendants objected and moved for a mistrial, but the trial court denied their motions, told the jury that the statement was not in response to a question asked, and instructed the jury to disregard the statement.

Hogans and Watkins argue that the court erred in failing to declare a mistrial because Lewis's statement was highly prejudicial as it implied that they had the ability and desire to have others kill Lewis and suggested that he was courageous to testify in the face of death threats, thereby improperly bolstering his own credibility. We conclude, however, that the trial court properly addressed the potential prejudice from Lewis's brief, unsolicited statement by

ordering jurors to disregard it. See Bunnell v. State, 292 Ga. 253, 257 (4) (735 SE2d 281) (2013) (noting that curative instructions are generally adequate to remedy a witness's inadvertent reference to the accused's other criminal acts); Scruggs v. State, 273 Ga. 752, 754 (2) (545 SE2d 888) (2001) (affirming use of curative instructions as an alternative to mistrial where such instructions "adequately preserved appellant's right to a fair trial"). Therefore, the trial court did not abuse its discretion in declining to declare a mistrial.

3. *The trial court did not err in allowing a medical examiner to testify about the post-mortem examination of the victim.*

Watkins argues that allowing the former chief medical examiner of Cobb County, Dr. Brian Frist, to testify in this case violated his confrontation right. He contends that because Dr. Frist was not among the Grady Hospital employees who conducted a physical examination of the victim and did not author the official report regarding bullet trajectories, his testimony was not based on his personal knowledge and was therefore inadmissible. Because Watkins did not object to Dr. Frist's testimony, we review Watkins's claim for plain error only. See OCGA § 24-1-103 (d). To establish plain error, Watkins

> must point to an error that was not affirmatively waived, the error
> must have been clear and not open to reasonable dispute, the error

26

must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings.

Lupoe v. State, 300 Ga. 233, 243 (4) (794 SE2d 67) (2016) (citation and punctuation omitted).

There was no error, much less plain error, in allowing Dr. Frist to testify. Watkins argues that only the Grady Hospital doctors were the examining physicians, and so the State was allowed to call only those doctors. But Dr. Frist was an examining doctor, even if he examined Gray only during the autopsy. There is no evidence that Dr. Frist testified about another doctor's observations or conclusions. Compare Bullcoming v. New Mexico, 564 U. S. 647 (131 SCt 2705, 180 LE2d 610) (2011) (introducing the testimony of a "surrogate" witness who does not perform or observe a test or certify its results violates the Confrontation Clause). And because Watkins was allowed to cross-examine Dr. Frist, there was no violation of the Confrontation Clause. McClendon v. State, 299 Ga. 611, 617 (4) (b) (791 SE2d 69) (2016) ("[A] Confrontation Clause violation occurs when a declarant is unavailable to be called as a witness, was not previously subject to cross-examination, and when the statements to be introduced at trial are 'testimonial' in nature." (footnote omitted)).

4. *The defendants' purported effort to "preserve" claims presents nothing for review.*

Watkins and Kemp purport to preserve arguments for purposes of possible future habeas corpus proceedings should there be a change in the law. With respect to cell-tower tracking evidence that they claim should have been suppressed, the defendants merely adopt by reference arguments previously made in the trial court. This is insufficient to satisfy this Court's Rule 22, which states in pertinent part, "[a]ny enumerated error not supported by argument or citation of authority *in the brief* shall be deemed abandoned. All citations of authority must be full and complete." (Emphasis supplied.) Accordingly, we will not consider arguments not properly presented in the defendants' briefs. See Holmes v. State, 301 Ga. 143, 146 (2) (800 SE2d 353) (2017). And although Kemp arguably satisfies Rule 22 in challenging his recidivist sentence, he acknowledges that his argument is foreclosed by Almendarez-Torres v. United States, 523 U. S. 224, 226-227 (118 SCt 1219, 140 LE2d 350) (1998), a decision we are bound to follow unless and until the United States Supreme Court overrules it. Therefore, the defendants' desire to preserve claims presents nothing to review.

<u>Judgments affirmed. All the Justices concur.</u>

Decided February 19, 2018 — Reconsideration denied March 29, 2018.

Murder. Cobb Superior Court. Before Judge Staley.

<u>Lee & Ziegler, Konrad G. W. Ziegler, Christopher R. Lee</u>, for appellant (case no. S17A1646).

<u>Mitchell D. Durham</u>, for appellant (case no. S17A1647).

<u>Griffin & Strong, David J. Maher</u>, for appellant (case no. S17A1648).

<u>D. Victor Reynolds, District Attorney, Michael S. Carlson, John S. Melvin, John R. Edwards, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General</u>, for appellee.