306 Ga. 90
FINAL COPY

S19A0366.  BLACKMON v. THE STATE.

Nᴀʜᴍɪᴀs, Presiding Justice.

Appellant Danny Blackmon, Jr., was convicted of felony murder and other crimes in connection with the shooting death of his wife Bobbie Blackmon. Appellant contends that the trial court abused its discretion by admitting certain hearsay statements into evidence during his trial, and that in its order denying his motion for new trial, the court improperly relied on facts that were not in evidence. Both of those claims are meritless, so we affirm.[1]

---

[1] Bobbie was killed on April 29, 2015. On June 13, 2016, a McDuffie County grand jury indicted Appellant for malice murder, felony murder, aggravated assault, two counts of possession of a firearm during the commission of a felony, and possession of methamphetamine. At a trial from March 20 to 22, 2017, the jury found Appellant not guilty of malice murder but guilty of the remaining charges. On March 23, 2017, the trial court sentenced him to serve life in prison for felony murder, five consecutive years for one of the firearm counts, and a three-year concurrent term for the drug offense; the court merged the remaining counts. On April 27, 2017, Appellant through his trial counsel filed an untimely motion for new trial, which he amended three times through new appellate counsel. See OCGA § 5-5-40 (a) ("All motions for new trial, except in extraordinary cases, shall be made within 30 days of the entry of the judgment on the verdict . . . ."). After hearing argument, the trial

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. On April 28, 2015, Appellant argued with his wife Bobbie about photographs of a sexual nature that were on her cell phone; Appellant believed that she had sent the photos to another man. Appellant took some pills, drank a bottle of cold medicine, cried, and yelled at Bobbie. He then left the mobile home that he shared with Bobbie, their daughter Leigh Ann Hathcock, and her children.

Around 8:00 p.m., Bobbie asked her niece Christina Turner, who lived in a camper just outside the mobile home, to drive her to her mother's house because she and Appellant were arguing. Shortly after Bobbie and Turner turned onto the road from their driveway, Appellant passed them in his car. He then turned his car around,

court denied the motion on July 13, 2018, and Appellant filed a notice of appeal on July 26. On September 24, this Court dismissed the appeal because the time period for filing a notice of appeal is not tolled by an untimely motion for new trial. See *Fulton v. State*, 277 Ga. 126, 126 (587 SE2d 20) (2003). On October 12, the trial court entered an order allowing Appellant to file an out-of-time motion for new trial, and he filed such a motion that same day. The court denied the motion on October 16, 2018. Appellant then filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2018 and submitted for decision on the briefs.

flashed his lights to signal Bobbie and Turner to stop, and pulled up beside their car. He told Turner that she "better get [her] ass back down to the house and [she] better not leave, [she] better not take [her] aunt nowhere." Appellant then threatened to shoot the car if Turner did not drive back to the mobile home. Bobbie told Turner to drive them back home.

As they drove, Bobbie said that she loved Turner and Turner's brother (Bobbie's nephew), that Turner should take care of Bobbie's daughters, and that Turner and Bobbie's daughters needed to "stick together." Bobbie also said that "this is it for her, that she was not leaving the house tonight." When they arrived at the mobile home, Appellant, who also had driven back there, began throwing his tools off the front porch, saying that "he didn't need no tools no more, he wasn't going to be working on nothing no more." Turner asked Bobbie if she wanted Turner to call the police; Bobbie said no, but told Turner, "stay with me, don't leave me."

Around 9:00 or 10:00 p.m., Appellant wrote letters to each of his three daughters. In one of the letters, he wrote, "I can't be here,

I will hurt your mother, y'all split everything three ways." Appellant then went into the woods near the mobile home with a rifle, apparently to kill himself. Bobbie did not attempt to stop him, and eventually he came back inside. Later that evening, Appellant tried to blow up a propane tank that was about 40 feet from the mobile home by turning on the gas and attempting to ignite a lighter. Bobbie yelled for him to stop, and Turner woke up Hathcock and her children and told them to get out of the mobile home because Appellant was "blowing the house up." When Appellant's lighter did not ignite, he said that Bobbie was a witch who had put a spell on it.

Later that night, Appellant and Bobbie drove together to pick up Appellant's mother, but they turned back when they learned that she had another place to stay. When they returned to the mobile home an hour or two later, they were calm. Bobbie then went to sleep in a chair in the living room. Turner stayed on a couch near Bobbie, who was scared and called out Turner's name several times during the night to make sure she was still nearby. Around 3:30 a.m., Appellant kicked Bobbie's chair and said, "get your ass up, come

here, I want to show you something." Bobbie followed him to their bedroom and sat on the bed as Appellant kneeled in front of her. Turner offered to come into the bedroom with them, but Bobbie replied, "No," and closed the door. Turner listened outside the door and heard Appellant and Bobbie talking.

Around 4:00 a.m., Hathcock heard a gunshot and Appellant's screams for help. She and Turner went into the bedroom and saw Bobbie sitting slumped over on the bed with a large gunshot wound on the left side of her neck. Turner called 911, and Appellant asked Hathcock if Bobbie was dead. Hathcock noticed that Bobbie was breathing and asked for Appellant's help. He, Turner, and Hathcock then drove Bobbie to the end of their long driveway to meet the emergency responders.

A sheriff's office sergeant and emergency medical providers responding to the 911 call met them as they turned out of the driveway. Bobbie was taken to a hospital, where she later died from her gunshot wound. Appellant told the sergeant that he had not meant to shoot Bobbie and that "he was trying to shoot himself and

he shot his wife." The sergeant searched Appellant and found in his pocket a small box that contained 1.69 grams of methamphetamine.

Near the carport outside the mobile home, investigators found a bloody jacket with a bullet hole in the collar and a bloody, black t-shirt. On the bed in Appellant and Bobbie's room, they found blood stains and five long guns. A 12-gauge pump-action shotgun was leaning against the bed. In the shotgun, there was one spent shell casing for a large solid bullet known as a "slug." Investigators found the slug that had passed through Bobbie's neck in a window frame in the bedroom. A firearms examiner later determined that the shotgun was functioning properly and required 3 and 3/4 pounds of trigger-pressure to fire. Bobbie's autopsy showed that the gun was between a few inches and three feet away when she was shot. The medical examiner also concluded that Bobbie had bleeding in her scalp caused by a blunt impact injury.

At trial, Appellant admitted to shooting Bobbie but claimed it was an accident. He testified as follows. After Bobbie went to sleep in the living room, he woke her, saying that they needed to talk and

carrying the shotgun in his hand. In the bedroom, he kneeled in front of her as she sat on the bed and put the gun, with the butt stock on the floor, under his chin. He pulled the trigger but the gun did not fire, so he opened the slide; Bobbie then pulled the top of the gun away from him, and the slide closed while his thumb was caught in the trigger, causing the gun to fire into Bobbie's neck. As he helped Turner carry Bobbie to the car, her jacket slipped over her head, and he dropped her on the ground.

Appellant also elicited testimony from the medical examiner that the blunt impact injury to Bobbie's head could have been caused by Appellant's dropping her. To rebut Appellant's accident theory, the State presented a GBI agent's expert testimony that based on the trajectory of the slug found in the window frame, the shotgun was in a "fairly level position" and the butt stock of the gun could not have been on the floor when Bobbie was shot.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the

record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to reject Appellant's accident defense and to find him guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Jones v. State*, 304 Ga. 320, 323 (818 SE2d 499) (2018) ("[I]t is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." (citation and punctuation omitted)).

2. Appellant contends that the trial court abused its discretion by admitting Turner's hearsay testimony about certain statements that Bobbie made to her on the evening before the shooting. We disagree.

"Hearsay" is an out-of-court statement that a party offers into evidence "to prove the truth of the matter asserted" in the statement. OCGA § 24-8-801 (c). See also *Carter v. State*, 302 Ga.

200, 204 (805 SE2d 839) (2017); *United States v. Jiminez*, 564 F3d 1280, 1287 (11th Cir. 2009).[2] Some of Bobbie's statements to Turner may not qualify as hearsay, because they may have been offered not to prove the truth of what she said (for example, whether Bobbie really loved Turner and Turner's brother) but rather only to show that Bobbie had made the statement (revealing her fear of Appellant). See OCGA § 24-8-801 (c); *United States v. Ledford*, 443 F3d 702, 708 (10th Cir. 2005), abrogated on other grounds by *Henderson v. United States*, ___ U. S. ___ (135 SCt 1780, 191 LE2d 874) (2015). But we need not decide the exact nature of each statement, because to the extent the statements were hearsay, they were admissible, as the trial court ruled, under the excited utterance exception to the hearsay rule. See OCGA § 24-8-803 (2); *Ledford*, 443 F3d at 710.[3]

---

[2] OCGA § 24-8-801 (c) essentially tracks its counterpart in the Federal Rules of Evidence; we therefore look to the decisions of the federal appellate courts, particularly the Eleventh Circuit, for guidance in applying this provision. See *Watson v. State*, 303 Ga. 758, 763 n.4 (814 SE2d 396) (2018).

[3] Over Appellant's objection, the trial court ruled that the statements at

The excited utterance exception says that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" shall not be excluded by the hearsay rule. OCGA § 24-8-803 (2). We have explained that "'the excited utterance need not be made contemporaneously [with] the startling event.'" *Robbins v. State*, 300 Ga. 387, 389 (793 SE2d 62) (2016) (quoting *United States v. Belfast*, 611 F3d 783, 817 (11th Cir. 2010)).[4] Rather, the court should consider the totality of the circumstances in determining whether the statement was made while the declarant was "'still . . . under the stress or excitement that the startling event caused.'" *Robbins*, 300 Ga. at 389 (quoting *Belfast*, 611 F3d at 817 (citing cases affirming

issue were admissible under both the excited utterance exception and the residual exception to the hearsay rule, see OCGA § 24-8-807. The residual exception applies, however, only to "statement[s] not specifically covered by any law . . . ." Id. Thus, if the hearsay statements at issue were admissible under the excited utterance law, they were not admissible under the residual exception.

[4] Like OCGA § 24-8-801 (c), OCGA § 24-8-803 (2) materially tracks its counterpart in the Federal Rules of Evidence; we therefore again look to the decisions of the federal appellate courts, particularly the Eleventh Circuit, for guidance in interpreting it. See *Jenkins v. State*, 303 Ga. 314, 317 (812 SE2d 238) (2018).

the admission as excited utterances of statements made even hours after the startling event)).

Here, the evidence indicated that after Appellant argued with Bobbie about her supposed infidelity, took some pills, drank a bottle of cold medicine, and yelled and cried, Bobbie enlisted Turner's help to escape to her mother's house. But Appellant unexpectedly intercepted them on the road just past their driveway, ordered Turner to take Bobbie home, and threatened to shoot Turner's car. During the short drive back to the mobile home, Bobbie said that she loved Turner and Turner's brother; that Turner should take care of Bobbie's daughters; that Turner and Bobbie's daughters needed to "stick together"; and that "this is it for her, that she was not leaving the house tonight."

From this evidence the trial court could reasonably find that Appellant's aggressive response to Bobbie's attempted escape, including his threat to shoot at the car she was in, qualified as a startling event. See, e.g., *Ledford*, 443 F3d at 710 (concluding that a domestic altercation between the appellant and his girlfriend, which

culminated in his threat to kill her, "was clearly a startling event"). The court also could reasonably conclude that Bobbie's statements moments later during the drive back home were made while she was still under the stress of Appellant's roadway threat. See, e.g., *United States v. Joy*, 192 F3d 761, 766 (7th Cir. 1999) (upholding the admission of an excited utterance made several minutes after the appellant's threat). Bobbie's statements related to Appellant's threat to shoot if Bobbie did not return home, because they indicated her belief that Appellant was going to kill her that night. See, e.g., *Woodward v. Williams*, 263 F3d 1135, 1138, 1141 (10th Cir. 2001) (concluding that the victim's statement, "He is going to kill me," related to the startling event of the appellant intruding into her house and shoving her father, and that the statement was properly admitted under the excited utterance exception); *United States v. Hartmann*, 958 F2d 774, 784 (7th Cir. 1992) (holding that the trial court did not commit plain error by admitting as an excited utterance the victim's statement to his lawyers that his wife and her lover were planning to kill him).

Appellant also argues that statements Bobbie made shortly after she and Turner arrived back at the mobile home were improperly admitted under the excited utterance exception. Turner testified that when she and Bobbie came home, Appellant began throwing his tools off the front porch, saying that he did not need them because "he wasn't going to be working on nothing no more." Turner then asked Bobbie if she wanted Turner to call the police; Bobbie said no, but told her, "stay with me, don't leave me." The trial court could reasonably find that Bobbie was still under the stress of excitement caused by Appellant's threat on the road when she made these statements, but even if that stress had dissipated, she was under the immediate and direct stress of Appellant's startling and destructive behavior on the porch of their home, and her statements related to that threatening behavior. See, e.g., *United States v. Hadley*, 431 F3d 484, 497 (6th Cir. 2005) (noting that "with or without the involvement of a weapon or threats of lethal violence, we are confident that a domestic disturbance can qualify as [a] startling event").

Appellant nevertheless asserts that none of Bobbie's statements to Turner comes under the excited utterance exception because the evidence did not show that Bobbie was "confused and distraught" when she made the statements. While such displays of emotion may support application of the excited utterance exception, the rule does not require that the declarant express any particular emotion when making the statement, only that she make the statement while still under the stress caused by the startling event. See OCGA § 24-8-803 (2). See also *United States v. Lossiah*, 129 Fed. Appx. 434, 437 (10th Cir. 2005) ("To come within the excited utterance exception, the declarant need not show signs of excitement immediately upon witnessing or experiencing a startling event."); *Joy*, 192 F3d at 766 ("[A] court need not find that the declarant was completely incapable of deliberative thought at the time [she] uttered the declaration.").

Bobbie's statements to Turner indicated that she was afraid of Appellant and upset by her husband's chaotic and threatening behavior. Turner testified that Bobbie was scared even when she

went to sleep later that night. The record supports the trial court's conclusion that Bobbie was under the continuing stress of excitement when she made each of the statements about which Appellant complains. Accordingly, the court did not abuse its discretion in admitting them. See *Robbins*, 300 Ga. at 390.

3. Appellant also contends that in its order denying his motion for new trial, the trial court erred by relying on facts that were not in evidence. In its order, the court concluded that the statements discussed in Division 2 above were correctly admitted under the excited utterance exception and found that Bobbie was under the effects of stress and excitement because she made the statements "within moments of an angry confrontation in the roadway in which [Appellant], among other things, threatened to shoot [Turner's] car." Appellant now claims that Turner did not testify that he made that threat on the roadway or that Bobbie heard the threat.

Turner clearly testified on direct examination, however, that when Appellant intercepted her and Bobbie on the roadway, he said that "[i]f [Turner] didn't turn the car back around, that he would

shoot the car, [Turner] better bring [her] ass back." And the trial court could reasonably infer that Bobbie heard that threat, because she then told Turner to drive them back to the mobile home. See *Woodward*, 263 F3d at 1141 (noting that the victim's excited utterance was related to the startling event of her husband's confrontation with her father, even though she was hiding in another part of the house during the confrontation, because the evidence supported the inference "that she heard the noise and panicked because of it"). The record therefore supports the trial court's findings. See *Lewis v. State*, 277 Ga. 534, 539 (592 SE2d 405) (2004) (explaining that the trial court's findings of fact on motion for new trial are upheld unless clearly erroneous).

Judgment affirmed. All the Justices concur.

Decided June 3, 2019.

Murder. McDuffie Superior Court. Before Judge Hammond.

Caryn Lobdell, for appellant.

William P. Doupé, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General, for appellee.