307 Ga. 711
FINAL COPY

S19A1301.  MOSLEY v. THE STATE.

BENHAM, Justice.

Appellant Rashard Mosley appeals his convictions for numerous offenses, including the murder of Ivory Carter and the attempted murder and attempted armed robbery of Frederick Knight.[1]  On appeal, Mosley contends that the evidence was

---

[1] The crimes occurred from July 30 to August 4, 2014.  In October 2014, a Chatham County grand jury returned a 32-count indictment charging Mosley and two co-indictees, LaQuan Brown and Keith Johnson, in connection with the offenses committed against Carter and Knight.  The 23 counts relevant to Mosley  are as follows: malice murder; four counts of felony murder (predicated on hijacking a motor vehicle, armed robbery, aggravated assault, and possession of a firearm by a first offender); two counts of hijacking a motor vehicle (Carter and Knight); three counts of aggravated assault (Carter and Knight); one count of armed robbery (Carter); two counts of criminal attempt to commit a felony (attempted murder and attempted armed robbery of Knight); nine counts of possession of a firearm during the commission of a felony (one count for the use of a firearm in each of the charged offenses); and possession of a firearm by a first-offender probationer (Knight). Co-indictee Brown was tried separately in February 2016 and convicted of numerous offenses, including murder.  This Court affirmed her convictions and sentences in October 2019. See *Brown v. State*, 307 Ga. 24 (834 SE2d 40) (2019).  Johnson pleaded guilty and testified at Mosley's trial.  Mosley was tried by a jury in May 2017.  The trial court directed a verdict of acquittal on the count charging felony murder predicated on possession of a firearm by a first offender (as well as the predicate felony).  The jury acquitted Mosley of malice murder but found

insufficient to sustain his convictions, that the trial court erroneously permitted the State to elicit various inadmissible hearsay statements, that the trial court erroneously permitted the State to adduce "intrinsic evidence," and that trial counsel was ineffective. Finding no reversible error, we affirm.

Viewed in a light most favorable to the verdicts, the evidence adduced at trial established as follows. In late July 2014, Mosley and his two co-indictees, LaQuan Brown and Keith Johnson,

---

him guilty of all other offenses.

On June 2, 2017, the trial court sentenced Mosley as a recidivist to serve: life in prison without the possibility of parole for felony murder predicated on aggravated assault; life in prison for the armed robbery of Carter to be served concurrently with the murder sentence; twenty years for hijacking Carter to be served concurrently with the murder sentence; five years for possession of a firearm during the commission of a felony (murder) to be served consecutively to the murder sentence; twenty years for hijacking Knight to be served consecutively to the sentence for possession of a firearm during the commission of a felony (murder); twenty years for the aggravated assault of Knight to be served consecutively to the sentence for hijacking Knight; and five years for possession of a firearm during the commission of a felony (attempted murder of Knight) to be served consecutively to the sentence for the aggravated assault of Knight, for a total sentence of life imprisonment without the possibility of parole plus 50 years to serve.

Just days later, Mosley filed a timely motion for new trial, which he later amended in June 2018 and September 2018. Following a hearing, the trial court denied Mosley's motion for new trial as amended on April 4, 2019. Mosley subsequently filed a timely notice of appeal to this Court; this case was docketed in this Court to the August 2019 term and submitted for a decision on the briefs.

checked in to a Savannah hotel; video surveillance from the hotel captured the trio on the property. Shortly after checking in, the trio left on foot to "meet some dude for some money." Johnson testified that Mosley was armed at the time and mentioned that the rendezvous was actually a robbery setup. According to Johnson, the trio arrived at the pre-arranged location, and he watched Brown get into a vehicle when it arrived. Johnson testified that Mosley approached the driver's side of the vehicle, that Mosley "tussled" with the male driver — later identified as Ivory Carter — and that a gun was fired while the two men fought. Johnson explained to the jury that the driver fled on foot after being shot and that he and his co-indictees fled in the man's blue SUV. Carter died as a result of the gunshot wounds. A few days later, Brown and Mosley went to stay at the home of Brown's cousin, Mary Singleton; the pair arrived at the residence in an SUV. While there, Singleton overheard the pair discussing a robbery that netted approximately $500.

Later that week, Brown placed a telephone call to Frederick Knight and arranged to meet him in the vicinity of Singleton's

residence. When Knight arrived, Brown got "halfway" into Knight's truck; Mosley approached the vehicle on the driver's side and placed a firearm to Knight's head, instructing him not to do anything. Knight pressed the accelerator and sped away, and shots were fired at his truck. Knight immediately reported the incident to police and later identified Mosley as one of the assailants. Singleton testified that, as to this incident, she heard Mosley and Brown discussing how it "went wrong."

Law enforcement later arrested Mosley and Brown at Singleton's residence and discovered Carter's battered Nissan Murano SUV parked in an adjacent lot. A search of the home revealed the firearm used against Knight and the keys to Carter's SUV secreted under a mattress. The jury heard testimony from Singleton that she lived with kids and did not keep guns in the residence; she also testified that she observed Mosley place the firearm under the mattress.

1. Mosley first contends that the evidence against him was insufficient with respect to the offenses involving Knight, arguing

4

that the "evidence was insubstantial," that it was "vague," and that it merely cast on Mosley a "grave suspicion" of guilt. It is well settled, however, that we view the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013). Here, Knight identified Mosley as his assailant, the firearm used during the offense was discovered in Singleton's residence (where Mosley was staying), and Mosley was identified as having hidden the firearm where it was discovered. Further, Singleton overheard Mosley make incriminating statements about the robbery going "wrong."[2] With respect to Carter, Johnson testified that Mosley was armed on the night of Carter's murder and that the arrangement to meet Carter was a setup; Johnson also

_____

[2] As discussed below, Mosley contends that Knight's identification was "fundamentally flawed" and that trial counsel was ineffective for failing to move to suppress it. He also argues that the evidence was insufficient because it was based, at least in part, on hearsay testimony. However, "in determining the sufficiency of the evidence, we consider all of the evidence admitted by the trial court, regardless of whether it was erroneously admitted." *Green v. State*, 291 Ga. 287, 289 (1) (728 SE2d 668) (2012).

identified Mosley as the triggerman in Carter's killing; Mosley arrived at Singleton's residence in the victim's vehicle; and the keys to the SUV were found alongside a firearm that Mosley concealed under a mattress. Accordingly, the evidence recounted above was plainly sufficient to support Mosley's convictions. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). Therefore, this claim is without merit.

2. Over Mosley's objection, the trial court permitted the State to present evidence and testimony concerning two uncharged offenses — the burglary of Prince Owens and the armed robbery and aggravated assault of George Jackson. The trial court concluded that evidence of the uncharged offenses was admissible "as intrinsic evidence of the same series of transactions as the crimes charged in the instant indictment." Mosley continues to argue on appeal that the trial court erred in this respect. We disagree.

While OCGA § 24-4-404 (b) ("Rule 404 (b)") generally controls the admission of other acts evidence, also known as "extrinsic evidence,"

evidence of criminal activity other than the charged offense is *not* "extrinsic" under Rule 404 (b), and thus falls outside the scope of the Rule, when it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense.

(citations and punctuation omitted; emphasis in original.) *United States v. Edouard*, 485 F3d 1324, 1344 (II) (C) (11th Cir. 2007). See also *Smith v. State*, 302 Ga. 717 (4) (808 SE2d 661) (2017).

[E]vidence pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.

(Citation and punctuation omitted.) *Williams v. State*, 302 Ga. 474, 485-486 (IV) (d) (807 SE2d 350) (2017). Finally, "[t]he evidence must also meet the balancing test of OCGA § 24-4-403 [('Rule 403')]." *Clark v. State*, 306 Ga. 367, 374 (4) (829 SE2d 306) (2019). We review the trial court's ruling for abuse of discretion. See *Fleming v. State*, 306 Ga. 240, 245 (3) (a) (830 SE2d 129) (2019).

As to the burglary, the jury heard testimony that, in late July

7

2014 — around the same time as the other charged offenses — Brown contacted Owens asking to be picked up at a local apartment complex. Owens arrived at the meeting spot and contacted Brown by phone; although Brown advised Owens that she would be "out in a minute," she never appeared. Owens eventually returned home and discovered that his home had been burglarized. The jury learned that Owens again attempted to reach out to Brown, but a male answered the call and, further, that the telephone number used to contact Owens was also used to contact Carter, the murder victim.

That same week, George Jackson was driving in the vicinity of Singleton's residence when he heard someone call out his name and then saw people on bicycles steer in front of his vehicle; Jackson stopped his SUV and two individuals jumped into his vehicle. One of the individuals, a woman, brandished a gun and demanded that Jackson turn over his keys. Following a struggle for the firearm, Jackson escaped on foot; his cellular telephone and car keys were taken from the vehicle. Jackson later identified Brown in a photo array, indicating that she "favored" the woman from the incident,

and Jackson's keys were found hidden under the mattress in Singleton's residence.

Though Brown and Mosley were not charged with all of the same offenses, the evidence suggests that Brown and Mosley engaged in a week-long crime spree. The burglary of Owens "was a link in the chain of events leading up to [Carter's] murder." See *Brown v. State*, 307 Ga. 24, 29 (2) (834 SE2d 40) (2019). Likewise, the incident involving Jackson occurred within days of Carter's murder and the day before the armed robbery of Knight; the incident involving Jackson occurred just blocks from Singleton's residence, and Singleton's telephone number was used in both offenses. Further, evidence from the incident involving Jackson was discovered alongside evidence from both Carter's murder and the incident involving Knight. The evidence of the uncharged offenses was, as the trial court concluded, evidence of the same series of transactions as the crimes charged in the indictment. See *Williams v. State*, 342 Ga. App. 564 (1) (804 SE2d 668) (2017) (evidence of uncharged carjacking admissible as intrinsic evidence where it

9

occurred in the middle of a three-day carjacking spree and where evidence from the uncharged offense helped connect defendant to charged offenses). See also *Johnson v. State*, 348 Ga. App. 831 (1) (823 SE2d 351) (2019); *Baughns v. State*, 335 Ga. App. 600 (1) (782 SE2d 494) (2016).

Further, though the intrinsic evidence indirectly implicated Mosley in additional criminal acts and had only minimal evidentiary value, we cannot say that the trial court abused its discretion in concluding that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. See *Olds v. State*, 299 Ga. 65, 70 (2) (786 SE2d 633) (2016) (recognizing the well-established principles that "[t]he major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect" and that "the exclusion of evidence under [that rule] is an extraordinary remedy which should be used only sparingly" (citations and punctuation omitted)).

3. Though Brown did not testify at Mosley's trial, the State

was permitted to adduce various statements and writings attributed to her. Mosley argues on appeal, as he did below, that this was erroneous and that Brown's statements were nothing more than inadmissible hearsay.

Though hearsay is generally inadmissible, see OCGA § 24-8-801, "[u]nder OCGA § 24-8-801 (d) (2) (E) [('Rule 801 (d) (2) (E)')], a statement by a defendant's co-conspirator made 'during the course and in furtherance of the conspiracy, including a statement made during the concealment phase of the conspiracy[,]' is not excluded by the hearsay rule when offered against the defendant." *Dublin v. State*, 302 Ga. 60, 63 (1) (805 SE2d 27) (2017) (quoting OCGA § 24-8-801 (d) (2) (E)). To admit such statements under this rule, "the State is required to show by a preponderance of the evidence that a conspiracy existed, the conspiracy included the declarant and the defendant against whom the statement is offered, and the statement was made during the course and in furtherance of the conspiracy." *Kemp v. State*, 303 Ga. 385, 392 (2) (b) (810 SE2d 515) (2018).

Mosley's arguments — which pertain to three sets of verbal or

11

written statements made by Brown — are premised on his contention that Brown's statements were not, in fact, made during the course and in furtherance of the conspiracy.[3] When reviewing the trial court's ruling in this respect, "we accept the trial court's factual findings . . . unless they are clearly erroneous. We apply a liberal standard in determining whether a statement is made in furtherance of a conspiracy, and statements that further the

---

[3] We need not delve into the co-conspirator analysis with respect to two additional challenged statements because the testimony was not, as Mosley contends, hearsay.

The first statement was made shortly after Carter's murder: Brown (who was pregnant at the time of the offenses) made an emotional telephone call to Singleton and asked Singleton to care for her child "[i]f anything happened" to Brown. Singleton testified about this conversation and testified that Brown made a similar request days later while staying at Singleton's residence. As the State rightly explains on appeal, this testimony was not hearsay as it was not offered to prove the truth of the matter asserted, that is, the State was not seeking to prove that Brown wanted Singleton to care for her child. Instead, the testimony established Brown's consciousness of guilt and apparent belief that she would be unavailable to raise her child. See *Blackmon v. State*, 306 Ga. 90, 94 (2) (829 SE2d 75) (2019) ("Some of [the statements] may not qualify as hearsay, because they may have been offered not to prove the truth of what [was] said . . . but rather only to show that [the declarant] had made the statement.").

Second, Singleton testified that she overheard Mosley *and* Brown discussing "getting money" from Carter's robbery and that she heard *them* say that "*they*" got "three or $500." There was no further clarification on this point and, thus, for all that appears, this statement is attributable to both Brown *and* Mosley; Mosley does not argue that his own statement was not admissible against him at trial. See *Haney v. State*, 305 Ga. 785 (4) (827 SE2d 843) (2019).

12

interests of the conspiracy in some way meet this standard." *Kemp*, 303 Ga. at 393 (2) (b).

(a) Singleton testified at trial that, shortly after Brown and Mosley arrived at her residence, she had an emotional conversation with Brown in which Brown disclosed that Mosley shot Carter. Mosley contends that this statement did not further the conspiracy but, instead, simply "spilled the beans" to Singleton. See *State v. Wilkins*, 302 Ga. 156, 160 (805 SE2d 868) (2017) (recognizing that "a statement which was not made 'to conceal the conspiracy and served only to disclose the scheme,' or which 'merely inform[ed] the listener of the declarant's activities,'" was not admissible under Rule 801 (d) (2) (E)). However, "[n]arratives of past events . . . are admissible under Rule 801 (d) (2) (E) if they serve some present purpose in the conspiracy." *Kemp*, 303 Ga. at 395 (2) (b) (ii). As such, the context of Brown's statement is important.

It is clear that Brown relied extensively on Singleton for help throughout the week-long crime spree. After Carter's murder, Brown telephoned Singleton for support and reassurance; later,

13

Brown and Mosley appeared at Singleton's residence looking for a place to stay, which Singleton provided; Brown later used Singleton's telephone to set up additional crimes, including the one involving Knight; and Mosley and Brown continued their crimes while staying at Singleton's residence and hid evidence in the residence while staying there. Brown's statement to Singleton — in which she identified Mosley as the triggerman — was made during an emotional conversation in which Brown asked Singleton for help. Thus, Brown's statement to Singleton was not simply a confession; instead, it was made as part of Brown's on-going relationship with Singleton and as part of Brown's continued need for assistance from Singleton — whether emotional or logistical — while she and Mosley continued to commit their crimes (and attempted to evade arrest). Accordingly, given the liberal standard applied to this inquiry, it was not clearly erroneous for the trial court to conclude that Brown's statement that Mosley shot Carter was made in furtherance of the conspiracy.

(b) Mosley next challenges the admission of jailhouse letters

14

drafted by Brown to Mosley, some written before she made incriminating statements to police and some written after. As to the pre-admission letters, Mosley asserts that "nothing in the letters demonstrate[s] anything other than a couple expressing their love and jealousness to one another." This argument, however, is unavailing. Though the letters touch on the couple's romantic relationship, the letters also plainly include commitments and reassurances concerning the pending charges. In one letter, Brown states that she will always be on Mosley's side, that she would die for him, and that she would lie under oath for him. In a separate letter, Brown characterizes herself and Mosley as "Bonnie & Clyde" and remarks that the couple is "in it" for the "long haul." In fact, Brown suggests that the couple can return to their criminal lifestyle upon their release. "[S]tatements that promote cohesiveness among, or provide reassurance to, other conspirators are made in furtherance of a conspiracy." *Kemp*, 303 Ga. at 395 (2) (b) (ii). Accordingly, it was not clearly erroneous for the trial court to determine that Brown's statements in her pre-admission writings

15

were made in furtherance of the conspiracy.

In the letters following her admission to police — an admission which implicated both Brown and Mosley in Carter's murder — Brown admits to Mosley that she spoke with law enforcement, and she asks for his forgiveness. The letters briefly describe what Brown told police about Mosley's involvement, what information the police have concerning the crime, what evidence the police lack, and how Mosley can help himself. In her letters, Brown relays to Mosley that investigators have not identified the actual shooter, she suggests that he could claim self-defense, and she tells him that, "no matter what," she would maintain that he was not the triggerman; she also suggested implicating their co-indictee as the actual shooter.

Mosley argues that Brown's statements in these letters cannot have been made in furtherance of the conspiracy or its concealment because the conspiracy ended following Brown's statement to police that incriminated both herself and Mosley, and, thus, that they were inadmissible hearsay. See *O'Neill v. State*, 285 Ga. 125, 126 (674 SE2d 302) (2009); *Crowder v. State*, 237 Ga. 141, 152 (227 SE2d 230)

16

(1976). Pretermitting whether this principle remains good law under Georgia's current Evidence Code,[4] any error in the admission of these letters was harmless. The letters in question pertain to Mosley's involvement in Carter's murder; however, the evidence against him in this regard was considerable. Video surveillance captured Mosley with his two co-indictees before and after Carter's alleged murder; Johnson testified that Mosley was armed on the night of Carter's murder and that the arrangement to meet Carter was a setup; Johnson identified Mosley as the triggerman in Carter's

---

[4] *Crowder* was concerned with harmonizing two "mutually exclusive" former Code sections concerning the admissibility of statements by a co-conspirator. See *Crowder*, 237 Ga. at 151-152 ("The question thus is whether that confession was inadmissible because made 'after the enterprise is ended' ([Ga. Code Ann.] § 38-414) or admissible because made 'during the pendency of the criminal project' ([Ga. Code Ann.] § 38-306). The two sections are mutually exclusive."). See also *Munsford v. State*, 235 Ga. 38, 42-43 (218 SE2d 792) (1975) (discussing the same). Likewise, decisions under Georgia's old Evidence Code declaring that "a conspirator's post-arrest statement to police incriminating a co-conspirator terminates the conspiracy," *O'Neill*, 285 Ga. 126, appear to be premised on former OCGA § 24-3-52, which provided that "[t]he confession of one joint offender or conspirator made after the enterprise is ended shall be admissible only against himself." See also *Fetty v. State*, 268 Ga. 365, 371 (489 SE2d 813) (1997). It does not appear that we have squarely addressed this issue under the current Evidence Code. See *Harvey v. State*, 300 Ga. 598, 603 (797 SE2d 75) (2017) (referencing the principle (but not addressing it) in a case in which the current Evidence Code was applicable), overruled on other grounds by *Nalls v. State*, 304 Ga. 168 (815 SE2d 38) (2018).

17

killing; Carter's SUV was found parked adjacent to Singleton's residence; the keys to Carter's SUV were found secreted under a mattress in Singleton's residence next to a firearm used in an armed robbery in which Mosley was identified as the gunman; and Singleton testified to hearing Mosley make various incriminating statements concerning the robbery gone wrong. See *Davis v. State*, 302 Ga. 576, 584 (4) (805 SE2d 859) (2017) ("Even if the statement . . . was deemed to be outside the co-conspirator exception to hearsay, its admission into evidence was harmless as it was merely cumulative of other evidence at trial . . . that [the appellant] was the shooter.").

(c) Finally, Mosley challenges as inadmissible hearsay certain statements made by Brown in a telephone call and letter to Owens, the victim of the uncharged burglary. Neither claim has merit.

First, Mosley takes issue with Owens' testimony concerning his telephone conversation with Brown on the day of the burglary, namely, that Brown asked Owens to pick her up. Mosley contends that these statements are inadmissible hearsay because they do not

"fit" into the State's theory that Brown was setting up "older men . . . so that she could carjack them." As an initial matter, Owens' testimony recounting Brown's statements was not hearsay. As the State correctly explains on appeal, Owens' testimony concerning the telephone conversation was not offered to prove the truth of the matter asserted; the State was not seeking to prove that Brown was at a specific location or that she needed a ride. Instead, this testimony simply explained why Owens left his residence and, eventually, linked the telephone number used by Brown to one used to contact Carter. Moreover, even assuming that the testimony was hearsay, the State demonstrated by a preponderance of the evidence the existence of a conspiracy, that the conspiracy involved Brown and Mosley (among others), and that the burglary of Owens was the first step in their week-long crime spree.

Second, in a letter to Owens — drafted before her interview with investigators — Brown asked Owens to reach out to Knight and convince him not to appear for court. Though Mosley contends that the letter "never mentions . . . Mosley" and that the letter served

19

only Brown's interests, the trial court was authorized to conclude that Brown's letter furthered the conspiracy in that it was an attempt to continue to conceal their crimes and avoid prosecution.

4. Finally, Mosley asserts that his trial counsel was constitutionally ineffective in failing to move to suppress Knight's pre-trial identification of Mosley and by failing to object to the State presenting Owens' prior testimony from Brown's trial. We agree with the trial court that Mosley is not entitled to relief.

To succeed on his claims, Mosley must show both that his trial counsel's performance was deficient and that he suffered prejudice as a result of counsel's deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). "To prove deficient performance, Appellant must show that his lawyer performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). Appellant must also show that "the deficient performance prejudiced the defense, which requires showing that

20

counsel's errors were so serious that they likely affected the outcome of the trial." *Jones v. State*, 305 Ga. 750, 755 (4) (827 SE2d 879) (2019).

"[S]atisfaction of this test is a difficult endeavor. Simply because a defendant has shown that his trial counsel performed deficiently does not lead to an automatic conclusion that he was prejudiced by counsel's deficient performance." *Davis v. State*, 306 Ga. 140, 144 (3) (829 SE2d 321) (2019). And "[i]f an appellant is unable to satisfy one prong of the *Strickland* test, it is not incumbent upon this Court to examine the other prong." (Citation and punctuation omitted.) Id. at 143 (3).  With these principles in mind, we address each of Mosley's arguments in turn.

(a) Within hours of the incident, law enforcement presented Knight with a six-photograph lineup that included an older photograph of Mosley, but Knight could not make an identification. Days later, police presented Knight with a second six-photograph lineup that included a different, more recent photograph of Mosley and a fresh set of photographs of individuals with similar features.

21

Though the second photographic lineup used an entirely different set of photographs, Mosley's photograph was unintentionally left in the same position in both lineups; Knight identified Mosley in the second lineup and later identified him at trial.

According to trial counsel, he was unaware until the middle of trial that Mosley's photograph had been left in the same position in both the first and second lineups. Trial counsel testified — and the record reflects — that, although he did not move to suppress the identification, trial counsel cross-examined the detective on this "mistake" and then, during closing argument, asserted that Knight's identification was not trustworthy. Mosley claims, however, that trial counsel rendered constitutionally ineffective assistance by failing to move to suppress the identification.

"When trial counsel's failure to file a motion to suppress is the basis for a claim of ineffective assistance, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion." *Richardson v. State*, 276 Ga. 548, 553 (3) (580 SE2d 224) (2003). Here, trial counsel would

22

have been required to demonstrate that "the identification procedure was impermissibly suggestive and, under the totality of the circumstances, the suggestiveness gave rise to a substantial likelihood of misidentification." *Clark v. State*, 271 Ga. 6, 12 (7) (b) (515 SE2d 155) (1999). An impermissibly suggestive identification procedure "is one which leads the witness to the virtually inevitable identification of the defendant as the perpetrator, and is equivalent to the authorities telling the witness, 'This is our suspect.'" (Citation and punctuation omitted.) *Williams v. State*, 286 Ga. 884, 888 (4) (b) (692 SE2d 374) (2010). "Where the identification procedure is not unduly suggestive, it is not necessary to consider whether there was a substantial likelihood of irreparable misidentification." Id.

Here, the fact that Mosley was the only one to appear in both the first and second lineups did not render the second lineup impermissibly suggestive. See *Clark v. State*, 279 Ga. 243 (4) (611 SE2d 38) (2005). Likewise, the second lineup was not impermissibly suggestive simply because Mosley's picture was inadvertently left in the same position in both lineups. See *Baugher v. State*, 212 Ga.

App. 7, 13 (3) (440 SE2d 768) (1994).  In fact, Mosley has failed to demonstrate that the identification procedure the police used was performed in an inherently suggestive manner.  Compare *Perry v. New Hampshire*, 565 U. S. 228, 243 (132 SCt 716, 181 LE2d 694) (2012) (identifying some improperly suggestive lineup procedures).  Mosley, "[h]aving failed to show that an objection to the identifications would have been successful, . . . has failed to establish deficient performance by his trial counsel." *Armour v. State*, 290 Ga. 553, 555 (2) (a) (722 SE2d 751) (2012).

(b)  Owens, the victim of the uncharged burglary, testified at Brown's trial; he was cross-examined, and his sworn testimony was transcribed.  Owens was scheduled to testify at Mosley's trial but was unable to appear because of an emergency medical condition requiring immediate heart surgery.  The transcript reflects that the parties agreed to read Owens' prior testimony into evidence at Mosley's trial.  The transcript also reflects that trial counsel initially opposed presenting Owens' prior testimony but that he eventually assented, stating as follows:

Owens knows my client[,] [a]nd I've been doing this a long time[.] I would bet a dollar and give you really good odds that if he comes in here and sits on this stand he's going to probably identify him in court.

Mosley argues on appeal, as he did below, that trial counsel was ineffective for agreeing to allow the State to present Owens' earlier testimony. According to Mosley, had trial counsel objected, it is likely that Owens' testimony would not have been admitted during trial.

Even if we presume that trial counsel performed deficiently in this regard, Mosley has failed to demonstrate prejudice. As Mosley recognizes on appeal, nothing in Owens' testimony directly implicates him in the burglary of Owens' residence. Indeed, the evidentiary value in Owens' testimony is in showing that the telephone number Brown used to communicate with Owens was also used to communicate with Carter. This fact is less pertinent in Mosley's trial because Johnson directly connected Mosley to Carter's murder and identified him as the shooter. In light of the limited value of Owens' testimony at Mosley's trial, Mosley has not shown

that trial counsel's decision here likely affected the outcome of trial. Accordingly, Mosley is not entitled to relief on his claim that he received ineffective assistance of counsel. See *Anthony v. State*, 303 Ga. 399, 410 (9) (811 SE2d 399) (2018) (failure to object to evidence not prejudicial to defendant cannot support a finding of ineffectiveness).

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 27, 2020.
Murder. Chatham Superior Court. Before Judge Abbot.
*Brian J. Huffman, Jr.*, for appellant.

*Meg E. Heap, District Attorney, Christine S. Barker, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General*, for appellee.