311 Ga. 26
FINAL COPY

S20A1539. PEARSON v. THE STATE.

NAHMIAS, Presiding Justice.

At his trial in September 2011, the jury found Appellant Gregory Pearson guilty of five counts of armed robbery, two counts of burglary, one count of aggravated assault, and six counts of possession of a firearm during the commission of a felony in connection with robberies in two motel rooms in Valdosta. In this appeal, he claims that his trial counsel provided ineffective assistance by failing to object to evidence of three witnesses' identification of Appellant at a roadside "showup." He also raises a claim of trial court error and a claim of ineffective assistance of counsel related to a surveillance video, because the video was authenticated by his accomplice, LaQuita Frazier, and Frazier identified him on the video. Finally, Appellant claims that the lack of a transcript of voir dire, opening statements, and closing arguments violates his constitutional right to due process. All of

these claims are meritless, so we affirm.

1. The evidence presented at Appellant's trial showed the following. On the evening of May 9, 2010, Harold Damron, John Sparks, Aimee Ellis, Shonda Mathis, and Mathis's two children were staying in a room at the Rodeway Inn in Valdosta. Around 9:15 p.m., a man knocked on the door. When Damron answered the door, the man asked him for a cigarette. Damron gave him a Marlboro Light cigarette and turned back toward the room. The man then pointed a black handgun at Damron's back and shoved Damron inside the room. The man waved his gun around, pointing it at everyone. He announced that he was robbing them and ordered them to give him all their money. He took some money from Damron, $3 from Sparks, and a $100 bill from Ellis's purse. He also took keys for three vehicles, which he then used to search the victims' vehicles in the parking lot as Damron and Ellis watched him from the motel window. After he was finished with the vehicles, he tried to get back in the motel room, but when the victims refused to open the door, he left. They then called 911. When the police arrived, Ellis told them

that the robber was a black man wearing a "white tank [top], hat, and white shorts and white shoes."

Around 9:40 p.m., Kevin McCafferty, Shannon Sheffield, and Ian Morrison, who had been out working together, returned to their rooms at the Quality Inn, which was next to the Rodeway Inn. McCafferty and Sheffield were sharing a room, and Morrison had a room next door. A man followed McCafferty and Sheffield into their room. He hit Sheffield in the head with a pistol, knocking Sheffield to the ground. The man then pointed his gun at them. Sheffield gave the man $15, and McCafferty, who "kept [his] eyes" on the man's gun and face, gave him $10. The man left. McCafferty saw a Texas license plate on the man's car.

Around this time, a man knocked on Morrison's door. Morrison pulled back the curtain of his window so he could see the man, who was wearing a white sleeveless shirt, a white hat, white shorts, and white socks.[1] Morrison did not let him in. Morrison saw a small, teal-

---

[1] Morrison gave this description of the man's complete outfit in his trial testimony. In his statement to the police immediately after the incident,

colored car with a Texas license plate backed into a space in the parking lot and a woman in a black outfit sitting in the driver's seat.[2] After the woman said, "Come on, let's go," the man in white clothes got into the car, and they drove away. McCafferty and Sheffield went to Morrison's room to tell him about the robbery, and they called the police, providing a description of the car and license plate.

Soon after, based on that description, police officers in nearby Florida pulled over the green Chevy Cavalier with a Texas license plate that LaQuita Frazier was driving with Appellant in the passenger seat. Frazier was wearing a black dress, and Appellant was wearing a white tank top, a white hat, white calf-length pants, and white shoes. Inside the car, there was a pack of Newport cigarettes, which Frazier later testified was the brand Appellant smoked; a single Marlboro cigarette; and a total of $152, including a

Morrison mentioned only that the man was black and was wearing a white tank top and white hat. McCafferty and Sheffield described the robber to the police only as a "black man," with no other specific details.

[2] Morrison testified that he had first noticed this car when he, Sheffield, and McCafferty drove into the parking lot because he travels frequently and he pays attention to his surroundings.

$100 bill, which Ellis later testified was the one that had been taken from her based on the way it was folded.

Valdosta police officers who had responded to the 911 calls from the motels told the robbery victims and Morrison that other officers had pulled someone over based on the description of the perpetrator's vehicle, and asked if anyone could identify the robber. Ellis, McCafferty, and Morrison then went with the officers to the traffic stop.[3] When Ellis, McCafferty, and Morrison arrived at the roadside where Appellant and Frazier's car was pulled over, they were allowed to walk close to the vehicle in which Appellant was sitting to see if they could identify him.[4] Ellis and McCafferty identified Appellant as the man who had robbed them, and Morrison identified Appellant as the man who knocked on his door. Morrison was also shown Frazier and identified her as the woman who had

---

[3] Ellis testified that she volunteered to identify Appellant because she was certain that she could identify him, explaining, "I will never forget that face."

[4] Neither Ellis nor Morrison testified about whether Appellant was in a police car, and McCafferty first testified that Appellant was in a police car but then testified that he could not remember. One of the officers who participated in Appellant's arrest testified that Appellant was put in the back of another officer's car.

been sitting in the car in the Quality Inn parking lot, and Morrison identified the car that the police had pulled over as the car that he had seen at the motel.

At trial, Ellis and McCafferty, as well as the other three victims who testified (Damron, Sparks, and Sheffield), identified Appellant in court as the man who robbed them, and Morrison identified Appellant in court as the man who knocked on his door. Ellis testified that she was certain that the man she identified at the roadside showup was the robber, and all of the witnesses testified that they had no doubt or question that Appellant was the man that they saw at the motel. Damron and Morrison also specifically testified that their identifications were based on what they remembered from the night of the robberies, with Morrison adding, "You just don't forget stuff like that." Ellis and Damron testified that the lights were on in their motel room, so they were able to see Appellant well, and Ellis added that the parking lot was well-lit.

Frazier, who had pled guilty to two counts of robbery and agreed to testify against Appellant, told the jury the following. She

6

and Appellant were driving on May 9, 2010, when Appellant said that he wanted to rob a woman Frazier knew. Appellant had a black handgun with him. When Frazier told Appellant that she did not know where his intended target lived, they went to a motel. Appellant got out of the car and returned after a short time. When he got back in the car, he pulled his gun out from under his clothes and put it on his lap. He told Frazier to drive a bit further. He saw someone unpacking a car and told Frazier to back up before the person got away. Appellant then got out of the car, and Frazier saw him hit the person with his gun. She yelled at Appellant to "come on." As Appellant got into the car, Frazier saw a man looking out the window from another room. They then drove toward Jacksonville, Florida. When the police started to follow them, Appellant threw his gun out the car window.

The gun was never recovered. Appellant did not testify at trial. The jury found Appellant guilty as charged, and the trial court sentenced him to serve life in prison plus five years and — after a long delay — denied his motion for new trial. This appeal followed.

2. As discussed above, Ellis, McCafferty, and Morrison identified Appellant at the roadside showup on the night of the crimes. Appellant's trial counsel filed a pretrial motion to suppress testimony about the showup identifications, arguing that the procedure was "unduly suggestive," "inherently unreliable," and "likely [to] cause misidentification." The record does not include an order ruling on the motion, however, and trial counsel did not mention the pretrial motion or otherwise object when the evidence of the showup identifications was admitted during the trial.

Appellant argues that his trial counsel's failure to secure a ruling on the suppression motion constituted ineffective assistance. To succeed on this claim, Appellant must show both that his trial counsel's performance was professionally deficient, meaning that counsel performed in an "objectively unreasonable way considering all the circumstances and in light of prevailing professional norms," and that Appellant suffered prejudice as a result, meaning that counsel's error "likely affected the outcome of the trial." *Mosley v. State*, 307 Ga. 711, 720 (838 SE2d 289) (2020) (citations and

punctuation omitted). See also *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). We need not address both parts of this test if Appellant fails to prove one. See *Mosley*, 307 Ga. at 720.

Appellant correctly points out that this Court has said that "a one-on-one showup is inherently suggestive." *Butler v. State*, 290 Ga. 412, 414 (721 SE2d 876) (2012) (citation and punctuation omitted). Nevertheless, evidence of an identification made during such a showup is inadmissible only if the showup procedure was *impermissibly* suggestive *and* there was a substantial likelihood of irreparable misidentification. See id. at 415. See also *Scruggs v. State*, 309 Ga. App. 569, 576 (711 SE2d 86) (2011) (holding that a showup procedure was not impermissibly suggestive).

We need not decide whether the showup procedure in this case was impermissibly suggestive, because even assuming that it was, Appellant has failed to show that there was a substantial likelihood of irreparable misidentification. See *Butler*, 290 Ga. at 415 (explaining that if there was no substantial likelihood of irreparable

9

misidentification, the reviewing court may pretermit the question of impermissible suggestiveness). Factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description, the level of certainty demonstrated by the witness at the identification, and the length of time between the crime and the showup. See, e.g., *White v. State*, 350 Ga. App. 218, 222-223 (828 SE2d 445) (2019); *Freeman v. State*, 306 Ga. App. 783, 785 (703 SE2d 368) (2010). See also *Neil v. Biggers*, 409 U.S. 188, 199-200 (93 SCt 375, 34 LE2d 401) (1972).[5]

---

[5] In this Court's 4-3 decision in *Brodes v. State*, 279 Ga. 435 (614 SE2d 766) (2005), the majority opinion, in considering the pattern jury instructions for criminal cases in Georgia courts, cited a "scientifically-documented lack of correlation between a witness's certainty in his or her identification of someone as the perpetrator of a crime and the accuracy of that identification" in holding that trial courts should "refrain from informing jurors they may consider a witness's level of certainty when instructing them on the factors that may be considered in deciding the reliability of that identification." Id. at 442. However, as indicated by the cases cited in the text above, Georgia courts have continued, as we are obliged to do on matters of federal constitutional law, to follow the holding of the United States Supreme Court in *Neil* that courts reviewing the admissibility of evidence of a showup identification as a matter of constitutional due process should consider "the level of certainty demonstrated by the witness at the confrontation." 409 U.S. at 199.

In this case, the evidence indicates that the likelihood of irreparable misidentification was low. Ellis, McCafferty, and Morrison each had a good opportunity to view the perpetrator at their motel rooms and paid attention to him at that time. Ellis testified that the lights were on in her room and the parking lot was well-lit, so she was able to see Appellant well. McCafferty was held at gunpoint by Appellant and testified that he focused on Appellant's face. And Morrison testified that he moved his curtain to look out the window when Appellant was at his door and generally paid close attention to his surroundings. All three witnesses indicated that they had no doubt that Appellant was the perpetrator, and although McCafferty and Morrison did not testify about their level of certainty at the time of the showup, Ellis testified that she had been certain that she correctly identified the robber. And the showup happened shortly after the crimes.

Although the pre-showup descriptions given by Ellis, McCafferty, and Morrison were not detailed, with all three witnesses giving the perpetrator's race and gender and Ellis and

Morrison mentioning some of his white clothing, nothing in those descriptions was inaccurate, and in any event the lack of detail alone does not require a finding of a substantial likelihood of misidentification. The totality of the circumstances does not show that the trial court would have found a substantial likelihood of misidentification. See, e.g., *Butler*, 290 Ga. at 415 (holding that there was not a substantial likelihood of irreparable misidentification when the victim "had [the] opportunity to view his attacker's face and focused his attention thereon," his description of the attacker was "'fairly accurate,'" and there was less than an hour between the crime and the identification (citation omitted)); *Freeman*, 306 Ga. App. at 785 (holding that there was not a substantial likelihood of irreparable misidentification, notwithstanding the victim's initial description of the robber's t-shirt color, when "the victim observed [the appellant] from 'two or three feet away' for several minutes while he was being robbed"; "the area of the parking lot where the robbery occurred was well lit"; the showup happened less than 30 minutes after the incident; and the

victim "expressed a high degree of certainty that [the appellant] was the man who robbed him"). "'[H]aving failed to show that an objection to the identifications would have been successful, [Appellant] has failed to establish deficient performance by his trial counsel'" for not securing a ruling on counsel's motion to suppress, so Appellant's claim falters on the first prong of the ineffective assistance test. *Mosley*, 307 Ga. at 721 (citation omitted).

3. Appellant makes two arguments related to a surveillance video that was recorded on the evening of the robberies. When Frazier testified, the State introduced the video, which was recorded at a Best Western motel where Appellant and Frazier briefly stopped before the robberies to visit Appellant's aunt. Frazier testified that the video reflected what happened there "exactly as [she] remember[ed] it," with no "alterations or deletions." Appellant objected to the admission of the video recording on the ground that Frazier was not a proper person to authenticate it. He argued that the State needed to present the operator of the machine that recorded the video or a similar person. The trial court overruled

Appellant's objection, concluding that Frazier's testimony that the video was a fair and accurate representation of what happened was sufficient.

The video was then played for the jury. It shows a man wearing a yellow shirt and white pants and a woman in a black dress get out of a greenish-blue car, go inside a building, and return a short time later, with the woman getting in the driver's side and the man getting in the passenger's side of the car. The video does not clearly show their faces, but Frazier testified that she was the woman and Appellant was the man.

(a) Appellant first renews his argument from trial that Frazier was not a proper person to authenticate the video. However, "[u]nder Georgia law, generally, a videotape is admissible where the operator of the machine which produced it, *or* one who personally witnessed the events recorded, testifies that the videotape accurately portrayed what the witness saw take place at the time the events occurred." *Moore v. State*, 305 Ga. 251, 255 (824 SE2d 377) (2019)

14

(citation and punctuation omitted; emphasis added).[6] Frazier testified that she personally witnessed the events recorded and that the video accurately portrayed them. Thus, the trial court did not abuse its discretion in concluding that she properly authenticated the video. See id. at 256.

(b) Appellant also argues that his trial counsel should have objected to Frazier's identification of him as the man seen on the video because the jury should have been able to decide this question for itself. See *Dawson v. State*, 283 Ga. 315, 320 (658 SE2d 755) (2008) ("[I]t is improper to allow a witness to testify as to the identity of a person in a video or photograph when such opinion evidence tends only to establish a fact which average jurors could decide thinking for themselves and drawing their own conclusions." (citation and punctuation omitted)). The video in this case, however, does not clearly show the man's face, so it would have been difficult for the jurors to identify the man. See id. at 321. By contrast,

---

[6] This standard was developed under Georgia's former Evidence Code, which applied at the time of Appellant's trial in 2011, and it was carried forward into the current Evidence Code. See *Moore*, 305 Ga. at 255 n.4.

Frazier, who was very familiar with Appellant, was a witness to the events in the video, so her testimony was not based merely on her opinion of whom she saw on the video, but also on her recollection of what she experienced in the parking lot. Thus, her identification of Appellant was admissible, see id. at 319-320, and Appellant's trial counsel did not perform deficiently by failing to object to it, see *Mosley*, 307 Ga. at 721.

4. Finally, Appellant argues that the lack of a transcript of his trial's juror voir dire, opening statements, and closing arguments violates his due process rights under the United States and Georgia Constitutions because — he asserts — he cannot supplement the transcript to support his claims of ineffective assistance of trial counsel. Under OCGA § 17-8-5 (a), "[t]he arguments of counsel at trial are not required to be transcribed," and "[v]oir dire is not required to be transcribed unless the prosecution is seeking the death penalty." *Dunlap v. State*, 291 Ga. 51, 53 (727 SE2d 468) (2012). See also *State v. Graham*, 246 Ga. 341, 341-342 (271 SE2d 627) (1980) (holding that a materially identical predecessor of OCGA

16

§ 17-8-5 (a) did not require voir dire to be transcribed in non-death penalty cases).[7]

If a defendant wants those parts of the trial transcribed, he may make a specific request. See, e.g., *Allen v. State*, 310 Ga. ___, ___ (851 SE2d 541) (2020) ("[I]f a defendant wants a more complete record of voir dire, he must make a specific request to that effect."). If, as in this case, the defendant does not make such a request and there is no transcript of voir dire, opening statements, or closing arguments, but the defendant believes that a transcript of those parts of the trial is necessary for his appeal, he may utilize the statutory process for supplementing a trial transcript found in OCGA § 5-6-41 (f) and (g). See *Bryant v. State,* 309 Ga. App. 649, 650 n.2 (710 SE2d 854) (2011) (noting that voir dire was not transcribed, but the record was supplemented pursuant to OCGA § 5-6-41 (f) to include information about dismissed jurors). See also *Stiles v. State*,

---

[7] OCGA § 17-8-5 (a) says in pertinent part: "On the trial of all felonies the presiding judge shall have the testimony taken down and, when directed by the judge, the court reporter shall exactly and truly record or take stenographic notes of the testimony and proceedings in the case, except the argument of counsel."

264 Ga. 446, 448 (448 SE2d 172) (1994) (holding that the appellant failed to demonstrate that a juror did not honestly answer a question during voir dire because "voir dire was not reported and appellant did not complete the record pursuant to OCGA § 5-6-41").

Appellant argues that the lack of a transcript of voir dire, opening statements, and closing arguments in this case violates his due process rights because he cannot pursue supplementation under OCGA § 5-6-41. This argument is premised on his assertion that because he seeks to raise claims of ineffective assistance of trial counsel, his trial counsel cannot participate in the creation of a supplemental transcript. However, this Court has rejected that premise:

> [The] contention that trial counsel could not be expected to assist appellate counsel because "trial counsel cannot be made to assert his own ineffectiveness" is without merit. Trial counsel would have been aiding in the reconstruction of the transcript, not using the transcript to demonstrate any error. . . . Moreover, in many of this Court's prior decisions on a reconstructed record, a defendant's trial counsel testified as part of the efforts at reconstruction, whether by affidavit or at a hearing held for that purpose.

*Bamberg v. State*, 308 Ga. 340, 350 n.9 (839 SE2d 640) (2020). Thus, Appellant's constitutional claim is meritless.

*Judgment affirmed. All the Justices concur.*

Decided March 1, 2021.

Transcript; constitutional question. Lowndes Superior Court. Before Judge Hardy.

*Conger & Smith, Gregory D. Smith*, for appellant.

*Bradfield M. Shealy, District Attorney, Catherine H. Helms, Michelle T. Harrison, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.