313 Ga. 178
FINAL COPY

S21A0981.  ANDERSON v. THE STATE.

BETHEL, Justice.

A DeKalb County jury found Jefferies Anderson guilty of malice murder and other offenses in connection with the shooting death of Jonathan Newton. Following the denial of his motion for new trial, Anderson appeals, arguing that the trial court erred by admitting intrinsic evidence and that his trial counsel provided constitutionally ineffective assistance. We affirm.[1]

---

[1] The crimes occurred on October 31, 2016. On February 9, 2017, Anderson was indicted by a DeKalb County grand jury for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), felony murder predicated on first-degree burglary (Count 3), felony murder predicated on possession of a firearm by a convicted felon (Count 4), aggravated assault (Count 5), first-degree burglary (Count 6), possession of a firearm by a convicted felon (Count 7), and possession of a firearm during the commission of a felony (Count 8). At a jury trial held from January 30 to February 5, 2019, Anderson was found guilty of all counts. On February 5, 2019, the trial court sentenced Anderson to life in prison without the possibility of parole on Count 1, 20 years in prison on Count 6, five years in prison on Count 7, and five years in prison on Count 8, with all sentences to run consecutively. Counts 2, 3, and 4 were vacated by operation of law, and Count 5 merged with Count 1 for sentencing. Anderson filed a motion for new trial on March 1, 2019, which he amended through new counsel on October 19, 2020. Following a hearing on December 11, 2020, the trial court denied the motion for new trial, as amended,

1. The evidence presented at trial showed the following. A video surveillance recording at an apartment complex located on Glenwood Avenue in Fulton County reflected that, just before noon on October 31, 2016, a man wearing a black hat, dark pants, and a gray and white striped shirt and carrying a backpack walked through a parking deck and broke into one of the apartment buildings. Around the same time, someone reported to the police that an unknown man attempted to enter an apartment in that complex. A woman inside the apartment screamed, and the man ran away.

Approximately an hour later and less than a mile away, at a different apartment complex on Metropolitan Avenue in DeKalb County, a man entered one of the apartment buildings, went to the fourth floor, and began knocking on doors of apartments on that floor. Two tenants who lived on the fourth floor saw a young African-

on December 18, 2020. Anderson filed a motion for out-of-time appeal, which the trial court granted on February 16, 2021. Anderson filed a notice of appeal on February 17, 2021. His appeal was docketed to this Court's August 2021 term and submitted for a decision on the briefs.

American male in the hallway around that time. One of the tenants said the man was wearing a hat.

Just after 1:00 p.m., a resident of the fourth floor heard someone kick in the door of another apartment down the hall. Soon after, Newton, who lived in an apartment on the fourth floor, came back from work for his lunch break with Clay Agee, his neighbor and co-worker. Newton saw that his apartment door had been kicked in, and he quickly went inside and found a man robbing it. Agee, who was standing just outside the door, saw that the assailant was wearing a surgical mask, a backward hat, a gray striped shirt, and black pants. Agee testified that although the top of the man's head and the lower part of his face were covered, he got a "good" and "clear" look at his eyes.

The man looked up, appeared to be surprised, and then reached for a handgun that was tucked into the waistband of his pants. Newton rushed into the apartment toward the man, struggled with him, and tried to wrap his arms around him to keep the gun down. Agee "froze," and Newton told him to "run, get out of here." As Agee

3

turned and ran away, he heard gunshots.

Agee reached the leasing office and learned that a neighbor had already called the police. The police arrived at the apartment complex less than a minute later. When the police reached Newton's apartment, they saw signs of a struggle and found Newton lying dead in the doorway of his apartment. There were also signs of forced entry into the apartment. A gun Newton kept in the apartment, a game console, and a laptop were later reported missing from the apartment.

Inside the apartment, the police located a black knit hat and four spent .38-caliber cartridges. A firearms examiner determined that all of the cartridges had been fired from the same gun and that they were consistent with having been fired from a Colt or Springfield .38-caliber pistol.

The medical examiner testified that Newton suffered multiple gunshot wounds from close range. Newton died from a gunshot wound to his chest, and the wounds were consistent with having been inflicted after a struggle between the shooter and the victim.

Agee was later asked by the police to review video recordings from a security camera on the door of one of the apartments on the fourth floor near Newton's apartment. The video recordings, which were played for the jury, were taken between 12:41 and 1:11 p.m. Two of the recordings showed an African-American male wearing a black hat, a gray and white striped shirt and dark pants and carrying a backpack as he walked back and forth on the fourth-floor hallway. According to a detective who reviewed the recordings, the hat found in Newton's apartment was "similar" to the one seen in the videos. The recording taken at 1:11 p.m. appears to show the man fleeing the fourth floor and running down a nearby stairwell while no longer wearing a hat. After reviewing the videos from the neighbor's door camera, Agee told the police that the man shown in the videos was the man who shot Newton. One detective testified that even though none of the videos clearly showed the man's face, the man shown in the videos taken from the door camera had a "similar description with a similar hat" as the man shown in the surveillance video taken from the Glenwood Avenue apartment

5

complex earlier in the day.

According to one of the detectives, Anderson eventually became a "person of interest." In his investigation, the detective compared a photograph of Anderson with the two videos taken from the Glenwood Avenue and Metropolitan Avenue apartment complexes. The detective testified that Anderson was "similar" to the man shown in the videos in "build, height, [and] physical characteristics." The detective also testified that although the videos were not taken from vantage points that allowed the police to see the suspect's face, the man shown in the videos had characteristics that were "very similar" to Anderson, which led the police to believe it was him shown in the videos.

On November 13, Agee was again interviewed by the police and was asked to view a photographic lineup containing pictures of six men.[2] Agee selected a picture of Anderson in the lineup and told the

---

[2] The record shows that, at the time of trial, Anderson had a visible scar on his face. The detective who prepared the photo lineup testified that he believed that the photo of Anderson used in the lineup was taken before he received the scar. On redirect examination, the detective noted that, in his

6

detective that he was about "70 percent" sure that was who he had seen in Newton's apartment. Agee testified that it was the man's eyes that led him to select his photo in the lineup he was shown.

The police collected the black hat that was found in Newton's apartment and sent it to the Georgia Bureau of Investigation ("GBI") for DNA testing. Following his arrest, the police obtained a buccal swab from Anderson that was also sent to the GBI. The testing showed that the primary DNA recovered from the hat belonged to Anderson.

At trial, Anderson called only one witness, his fiancée, Tilicia Boyd. Boyd testified that she and Anderson were together at her grandmother's house throughout the day on October 31.[3] Anderson introduced a photo Boyd took of him and posted to Instagram that

---

interviews, Agee stated that, at the time of the shooting, the suspect was wearing a surgical mask. The detective testified that the mask would have probably covered "a good portion" of the scar.

[3] On cross-examination, Boyd admitted (but later denied) that she told an investigator that she had no actual memory of October 31 but that she and Anderson would have normally been together at her grandmother's house throughout the day because she cared for her grandmother and Anderson was not working at the time. The State called the investigator as a rebuttal witness, and he testified that Boyd told him that she had no specific recollection of October 31 and that she was basing her recollection on their typical routine.

day. It was not clear at what time the photo was taken. Anderson and the State stipulated that, prior to the murder, Anderson was convicted of a felony.

2. Anderson first argues that the trial court erred by admitting evidence from the burglary at the Glenwood Avenue apartments as intrinsic evidence. We see no abuse of the discretion in the trial court's admission of the evidence on that basis.

Before trial, the State moved to admit evidence of the Glenwood Avenue burglary. The State asserted in its motion and in a pre-trial hearing that the evidence was intrinsic to the charged offenses or, in the alternative, that the evidence should be admitted under OCGA § 24-4-404 (b) ("Rule 404 (b)") for the limited purpose of showing intent, identity, plan, and scheme on the part of Anderson.[4] The trial court ruled that the evidence was intrinsic. The

_____

[4] Rule 404 (b) provides, in pertinent part:
> Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

8

trial court adhered to its ruling when it denied Anderson's motion for new trial, determining that the evidence of the Glenwood Avenue burglary was part of the same series of transactions as the charged offenses, that it was necessary to complete the story of the crime and inextricably intertwined with the evidence regarding the charged offense, and that, along with the testimony of other witnesses, the evidence helped to explain that the intruder was unlikely to be a resident of the apartment complex because he had just attempted another break-in an hour earlier. The trial court also determined that the evidence satisfied the balancing test under OCGA § 24-4-403 ("Rule 403"),[5] noting that any prejudice from the introduction of the Glenwood Avenue video was minimal given that the intruder's face was not visible and because Anderson denied that he was the person shown.

Whereas Rule 404 (b) generally controls the admission of other-

---

[5] Rule 403 provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

9

acts evidence, also referred to as "extrinsic evidence" under our current Evidence Code,

> evidence of criminal activity other than the charged offense is not extrinsic under Rule 404 (b), and thus falls outside the scope of the Rule, when it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense. Evidence pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.

(Citations and punctuation omitted.) *Brown v. State*, 307 Ga. 24, 29 (2) (834 SE2d 40) (2019). "There is no bright-line rule regarding how close in time evidence must be to the charged offenses, or requiring evidence to pertain directly to the victims of the charged offenses, for that evidence to be admitted properly as intrinsic evidence." (Citation and punctuation omitted.) *Hughes v. State*, 312 Ga. 149, 152 (1) (861 SE2d 94) (2021).

"The limitations and prohibition on [extrinsic] evidence set out in OCGA § 24-4-404 (b) do not apply to intrinsic evidence."

10

(Citations, punctuation and footnote omitted.) *Williams v. State*, 302 Ga. 474, 485 (IV) (d) (807 SE2d 350) (2017). "We review the trial court's ruling for abuse of discretion." *Brown*, 307 Ga. at 29 (2).

Here, the trial court did not abuse its discretion in determining that the evidence of the Glenwood Avenue burglary roughly an hour before Newton's shooting "was a link in the chain of events leading up to the murder and completed the story of the crimes for the jury." *Brown*, 307 Ga. at 29 (2). As the trial court determined, that evidence showed an event that occurred close in both time and space to the charged offenses and helped to explain to the jury that the events at the Metropolitan Avenue apartments were part of a series of attempted burglaries by Anderson that day.

Intrinsic evidence must also meet the balancing test of Rule 403. See *Mosley v. State*, 307 Ga. 711, 714 (2) (838 SE2d 289) (2020). Here, although the evidence implicated Anderson in another criminal act, the probative value of the evidence concerning the burglary at the Metropolitan Avenue apartments was not substantially outweighed by the danger of unfair prejudice. See

11

*Brown*, 307 Ga. at 30 (2); see also *Olds v. State*, 299 Ga. 65, 70 (2) (786 SE2d 633) (2016) (noting the well-established principles that "[t]he major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect" and that "the exclusion of evidence under [that rule] is an extraordinary remedy which should be used only sparingly" (citations and punctuation omitted)). This enumeration of error fails.

3. Anderson also argues that his trial counsel provided constitutionally ineffective assistance in a number of ways. To prevail on these claims, Anderson

> has the burden of proving both that the performance of his lawyer was professionally deficient and that he was prejudiced as a result. To prove deficient performance, [Anderson] must show that his trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms. To prove resulting prejudice, [Anderson] must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. In examining an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one.

(Punctuation omitted.) *Stuckey v. State*, 301 Ga. 767, 771 (2) (804 SE2d 76) (2017) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984)). "A strong presumption exists that counsel's conduct falls within the broad range of professional conduct." (Citation and punctuation omitted.) *Ford v. State*, 298 Ga. 560, 566 (8) (783 SE2d 906) (2016).

(a) Anderson first argues that his trial counsel performed deficiently by failing to request a limiting instruction when evidence of the Glenwood Avenue burglary was admitted at trial. He also claims that counsel performed deficiently by later failing to object when a limiting instruction regarding the evidence, which counsel requested in the charge conference, was omitted in the trial court's final charge to the jury. However, in order to prevail on this claim, Anderson must show that the request would have been granted or that the objection to the final charge would have been sustained had they been made. He cannot do so here because, as we determined above, the trial court did not abuse its discretion by admitting the

13

evidence in question as intrinsic evidence. Because a limiting instruction generally is not warranted for intrinsic evidence, Anderson cannot show that his trial counsel performed deficiently by failing to request such an instruction when the evidence was presented at trial or by failing to object to the final charge to the jury as given by the trial court. See *Harris v. State*, 310 Ga. 372, 385 (4) (a) (850 SE2d 77) (2020).

(b) Anderson also argues that his trial counsel performed deficiently by failing to object when two detectives testified about what they observed in the surveillance videos from the Glenwood Avenue and Metropolitan Avenue apartments that the State introduced. Anderson argues that an objection would have prevented the detectives from identifying Anderson in the videos. We disagree that counsel performed deficiently.

At trial, Detective Scott Demeester testified about the video taken from the camera on Newton's neighbor's door:

> PROSECUTOR: Did you become aware of some video while you were at the scene in another apartment?
> WITNESS: Yes, I was.

14

. . .

PROSECUTOR: And was there anything significant after processing the scene and watching the video that occurred to you?

WITNESS: Yes.

PROSECUTOR: What was that?

WITNESS: The video that I saw, there was a black male, appeared to be walking down the hallway of the apartment complex. I believe he was captured in one of the neighboring [apartment's] ring camera. I know the subject appeared to have some sort of black hat on the top of his head.

PROSECUTOR: I'm going to show you what has already been admitted into evidence as State's Exhibit 9.

(Whereupon State's Exhibit No. 9 was played in open court.)

PROSECUTOR: Is this one of the clips that you observed?

WITNESS: Yes, ma'am.

(Whereupon State's Exhibit No. 9 continued to be played in open court.)

PROSECUTOR: Was this a clip you observed?

WITNESS: Yes, ma'am.

(Whereupon State's Exhibit No. 9 continued to be played in open court.)

PROSECUTOR: How about this clip?

WITNESS: Yes, ma'am. I don't recall if I watched each one of these. The one I do recall, the subject had the hat on his head, this one, and the one prior.

(Whereupon State's Exhibit No. 9 continued to be played in open court.)

15

PROSECUTOR: And did you observe any video with the hat removed?

WITNESS: I'm not sure if it was while I was there on the scene or if it was after the fact, but I do recall seeing video of the subject fleeing the area.

PROSECUTOR: And this one is marked 13:11. What time is that?

WITNESS: That's 1:11 p.m. military time.

(Whereupon State's Exhibit No. 9 continued to be played in open court.)

PROSECUTOR: Is that the video you observed of the suspect fleeing?

WITNESS: Yes, ma'am.

PROSECUTOR: Did he appear to have a hat on his head at that point?

WITNESS: No, ma'am, he did not.

Later, Detective Kyle Kleinhenz testified about the video he

observed:

PROSECUTOR: Was there anything of note to you in your investigation after watching those clips?

WITNESS: Several clips we pulled from that video. Of note, there was a black male with a black hat, dark pants, and a backpack in the hallway around the time of the shooting. And the hat was similar to what we found next to the victim, which was why it was of interest and collected, and it was also the same area that Mr. Agee told us the struggle happened.

. . .

PROSECUTOR: Was there anything about any of those video clips that suggested to you that the suspect may have left his hat in the apartment?

16

WITNESS: Yes. Because when he ran past the door in one of the clips, there is no hat anymore, the hat is gone.

PROSECUTOR: Did you ever get alerted about another break-in nearby this location?

WITNESS: Yeah. About .7 miles from this location at 1205 Metropolitan Avenue is another location, 880 Glenwood Avenue. And that's only .7 miles away from where this homicide took place.

PROSECUTOR: Did you respond to that location as well?

WITNESS: Yes, I did.

PROSECUTOR: And did you locate any evidence of value while you were there?

WITNESS: Yes. We saw a male in [sic] a similar description with a similar hat.

DEFENSE COUNSEL: Your honor, I'm going to object to describing videos that the jury has already seen and putting his own feeling on. That video has been admitted to the jury. The jury can decide what they see on the video.

PROSECUTOR: Your honor, he is explaining his investigation to the jury and why he did the things that he did. He can explain that he found this video relevant because he believed the person appeared to be the same person in the other video.

COURT: I deny the objection.

PROSECUTOR: And why was it of interest to you, Detective Kleinhenz?

WITNESS: Because the male had — it wasn't close enough to see his face in either video. The characteristics, the hat, the physical characteristics, were similar to what we saw in the ring, in the video from what we saw in the ring door video.

Anderson argues that, had his trial counsel objected to

Detective Demeester's testimony and objected earlier to Detective

Kleinhenz's testimony that neither would have been permitted to "narrate" the video and describe what they had seen.[6] However, neither detective identified Anderson as the person in the videos as they were being played to the jury, only referred to the person depicted in the videos as the "black male," the "subject," or the "suspect," and provided comparisons between the two videos. Moreover, to the extent the detectives' testimony included opinions or inferences about who or what could be seen in the videos, Anderson has failed to show that, had a timely objection been made, such statements would have been excluded under OCGA § 24-7-701 (a),[7] as the trial court would not have abused its discretion by

---

[6] Anderson cites two Court of Appeals decisions for this proposition: *Mitchell v. State*, 283 Ga. App. 456, 458-459 (641 SE2d 674) (2007), and *Carter v. State*, 266 Ga. App. 691, 692-693 (2) (598 SE2d 76) (2004). Both of those cases relied upon former OCGA § 24-9-65 for the proposition that it is improper to allow a witness to testify as to the identity of a person in a video when such opinion evidence goes to a factual issue the jury is called upon to determine. However, former OCGA § 24-9-65 was repealed in 2013 as part of the enactment of Georgia's current Evidence Code and replaced by OCGA § 24-7-701 (a). See *Jordan v. State*, 293 Ga. 619, 621 (2) (a) n.2 (748 SE2d 876) (2013). Former OCGA § 24-9-65 therefore did not apply to Anderson's trial, which took place in 2019.

[7] OCGA § 24-7-701 (a) provides:

If the witness is not testifying as an expert, the witness's

determining that the detectives' statements were "rationally based on inferences [they] formed by reviewing the surveillance video and other evidence and by interviewing witnesses" and that their "testimony about those inferences was helpful to determine" who could be seen in the videos and thus who committed the crimes. *Thornton v. State*, 307 Ga. 121, 128 (3) (c) (834 SE2d 814) (2019). Therefore, neither an objection to Detective Demeester's testimony nor an earlier objection to Detective Kleinhenz's testimony on this basis would have had any merit, and the "failure to make a meritless objection cannot support a claim of ineffective assistance." (Citation and punctuation omitted.) *Harris v. State*, 304 Ga. 652, 658 (2) (c) (821 SE2d 346) (2018).

(c) Finally, Anderson argues that his trial counsel performed deficiently by failing to move to suppress the introduction of Agee's

testimony in the form of opinions or inferences shall be limited to those opinions or inferences which are:
    (1) Rationally based on the perception of the witness;
    (2) Helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and
    (3) Not based on scientific, technical, or other specialized knowledge within the scope of Code Section 24-7-702.

identification of Anderson in the photo lineup. We disagree.

When trial counsel's failure to file a motion to suppress is the basis for a claim of ineffective assistance, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion. See *Mosley*, 307 Ga. at 720-721 (4) (a).

> Here, trial counsel would have been required to demonstrate that the identification procedure was impermissibly suggestive and, under the totality of the circumstances, the suggestiveness gave rise to a substantial likelihood of misidentification. An impermissibly suggestive identification procedure is one which leads the witness to the virtually inevitable identification of the defendant as the perpetrator, and is equivalent to the authorities telling the witness, "This is our suspect." Where the identification procedure is not unduly suggestive, it is not necessary to consider whether there was a substantial likelihood of irreparable misidentification.

(Citations and punctuation omitted.) Id. at 721 (4) (a).

Here, Anderson argues that the identification procedure was tainted because Agee was shown videos of the suspected perpetrator before Agee was asked to identify him in a photographic lineup. However, Anderson has not shown that the process by which Agee

20

identified him in the photographic lineup was impermissibly suggestive. He therefore cannot show that a motion to suppress the identification would have been granted had his trial counsel filed one.

Agee's identification of Anderson occurred in two stages. First, shortly after the crimes, Agee was asked to review the surveillance videos from Newton's neighbor's apartment door camera and from the Glenwood Avenue apartments. Upon reviewing those videos, Agee told the police that the man shown in the videos was the person who burglarized Newton's apartment and shot him.

Two weeks later, Agee was again interviewed by the police and was asked to view a photographic lineup containing pictures of six men. The lineup was constructed with driver's license or booking photos of men who were all the same race and age (plus or minus two years) and who had similar physical characteristics to those of the suspect. The photographs were then placed in a folder. Because the detective who constructed the lineup knew which of the photographs was of Anderson, he asked a second detective who did

21

not know which photograph showed the suspect to administer the lineup with Agee. Agee was then given an admonition regarding the lineup, which he and the detective signed.[8] Agee selected the picture of Anderson in the lineup and told the detective that he was about "70 percent" sure that was who he had seen in Newton's apartment. Agee testified at trial that it was the man's eyes that led him to select his photo in the lineup he was shown.[9]

---

[8] That admonition stated the following:

I am about to show you a group of photographs to see if you can make an identification of the person who committed the crime now being investigated. This group of photographs may or may not include a photograph of the person who committed the crime.

You should only make identification if you can do so. You may not talk to anyone while viewing the photographs.

Since hair styles, beards[,] and mustaches are easily changed, the photographs you are viewing may or may not depict the hairstyle or the facial hair similar to that of the person who committed the crime. Also note that photographs do not always depict the true complexion of a person; it may be lighter or darker than shown. Pay no attention to markings or numbers appearing in any particular photograph.

Please do not discuss with witnesses whether or not you have selected a photograph during this showing.

[9] We note that this procedure appears to comport with guidelines set forth in OCGA § 17-20-2, which requires law enforcement agencies to establish a policy for the conduct of live lineups, photo lineups, and "showups." With respect to photo lineups, such policy must include having an individual who does not know the identity of the suspect conduct the photo lineup or, where the person conducting the lineup knows the suspect, utilizing a procedure in which "photographs are placed in folders, randomly shuffled, and then

22

Here, although only one person was shown in the security videos Agee viewed, the detectives' trial testimony established, and the trial court found, that the videos did not show a clear picture of the person's face. Importantly, the detective only asked Agee at the time if the person shown in the video was the person he saw in Newton's apartment. The detective never used Anderson's name or gave Agee any more information. Moreover, when Agee saw Anderson in Newton's apartment, Anderson was wearing a hat and

presented to the witness so that the individual conducting such procedure cannot physically see which photograph is being viewed by the witness until the procedure is complete[.]" OCGA § 17-20-2 (b) (2) (B). The person administering the lineup is also to instruct the witness "that the perpetrator of the alleged crime may or may not be present in the . . . photo lineup[.]" OCGA § 17-20-2 (b) (3). The photo lineup should be composed such that the fillers "generally resemble the witness's description of the perpetrator of the alleged crime[,]" OCGA § 17-20-2 (b) (4), and should have a minimum of five fillers. OCGA § 17-20-2 (b) (5). The individual conducting the photo lineup is also to

> seek and document, at the time that an identification of [a] photograph is made, and in the witness's own words without necessarily referencing a numeric or percentage standard, a clear statement from the witness as to the witness's confidence level that the . . . photograph identified is the . . . photograph of the individual who committed the alleged crime.

OCGA § 17-20-2 (b) (6). We reiterate, however, that "failure to follow the procedures contained within the statute does not require automatic exclusion[,]" but is instead a factor the court should consider when an identification is challenged. *Kirkland v. State*, 310 Ga. 738, 741-742 (2) (a) (854 SE2d 508) (2021); see also OCGA § 17-20-3.

23

a surgical mask. It was only when Agee identified Anderson in the photographic lineup two weeks later that he was actually presented with a picture of Anderson's face. And even then, Agee testified that it was Anderson's eyes, which he had seen, that led him to select Anderson in the lineup.

Based on the foregoing, faced with a motion to suppress, the trial court would have been authorized to conclude that the photographic lineup administered to Agee was not impermissibly suggestive.[10] See *Kirkland v. State*, 310 Ga. 738, 742-743 (2) (c) (854 SE2d 508) (2021) (holding that photo lineup was not impermissibly suggestive where, despite having possibly seen other images of suspect between the date of the crime and the photo lineup, the

---

[10] Anderson also argues that Agee's identification of Anderson in the photo lineup would have been inadmissible because Agee did not know Anderson, only had a few seconds to see Anderson before the attack, saw him with his face partially covered, identified him with only 70 percent certainty, and only did so two weeks after the crimes were committed. However, absent a showing that the photo lineup was impermissibly suggestive, these factors do not affect the admissibility of the identification. See *Blackmon v. State*, 300 Ga. 35, 37-38 (3) (793 SE2d 69) (2016) (noting that factors affecting the witness's ability to perceive the defendant relate to "the determination of whether there was a substantial likelihood of misidentification, an issue that arises only *after* a court determines the identification procedure was impermissibly suggestive" (emphasis in original)).

lineup was the only time other than the time of the crimes when the witness saw the suspect's face); *Roseboro v. State*, 308 Ga. 428, 434 (2) (841 SE2d 706) (2020) (lineup not impermissibly suggestive where none of the circumstances of the lineup's presentation led the witness to a "virtually inevitable identification of [the suspect] as the perpetrator" (citation and punctuation omitted)); see also *Thomas v. State*, 310 Ga. 579, 585-586 (4) (853 SE2d 111) (2020) (no abuse of discretion in denying motion to suppress where trial court was authorized to conclude that the photographic lineup was not impermissibly suggestive). Thus, Anderson has not made the required showing that Agee's out-of-court identification would have been excluded had trial counsel moved to suppress it. See *Roseboro*, 308 Ga. at 435 (2) (a); *Mosley*, 307 Ga. at 721 (4) (a). He has therefore failed to demonstrate that his counsel performed deficiently.[11]

---

[11] Anderson also claims that reversal of his convictions is warranted because of the cumulative prejudice arising from the alleged trial court evidentiary error and deficient performance on the part of his trial counsel. See *State v. Lane*, 308 Ga. 10, 21-23 (4) (838 SE2d 808) (2020). However, we need not conduct cumulative-prejudice review under *Lane* in this case because we have not identified any trial court error or deficient performance on the part of counsel.

*Judgment affirmed. All the Justices concur.*

Decided February 15, 2022.

Murder. DeKalb Superior Court. Before Judge Parker-Smith.

*Kempter Law Group, Christina M. Kempter*, for appellant.

*Sherry Boston, District Attorney, Deborah D. Wellborn, Shannon E. Hodder, Tauri L. Thomes, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.